# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

TRANSITO TRUJILLO,

       Plaintiff,

vs.                                     No. CIV 02-1146 JB/LFG

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,
JOSEPH VIGIL and SUSIE PECK, Albuquerque
Public Schools Superintendents individually and
in their official capacities; ANTHONY GRIEGO,
Principal, Valley High School, individually and in
his official capacity; BRUCE SMITH, Valley High
School Assistant Principal, individually and in his
official capacity; RONALD WILLIAMS, Director
of Certified Staffing, Albuquerque Public Schools,
individually and in his official capacity; and MARK
MAYERSTEIN, Valley High School employee,
individually and in his official capacity,

       Defendants.

       and

TRANSITO TRUJILLO,

       Plaintiff,

vs.                                       No. CIV 03-1185 JB/LFG

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS;
MARK MAYERSTEIN, Senior ROTC
Instructor, and ANTHONY GRIEGO,
Valley High School Principal, in their
official and Individual capacities,

       Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on (i) Defendant Mark Mayerstein's Motion for Summary Judgment, filed October 10, 2003 (Doc. 74), and (ii) Plaintiff Transito Trujillo's Motion for Summary Judgment as to Plaintiff's § 1983 Claim Against Defendant Mayerstein, filed October 10, 2003 (Doc. 71).[1]  The Court held a hearing on these motions on January 9, 2004.[2]  The primary issues are whether there are any genuine issues of material fact whether: (i) there is an actionable adverse action; (ii) there is a link between any speech protected by the First Amendment and Mayerstein's actions; and (iii) anything Mayerstein did amounts to a constitutional violation. Consistent with the Court's ruling at the hearing on these motions, and for the reasons given at the time of the hearing, the Court finds that Mayerstein is entitled to qualified immunity, and the Court will grant Mayerstein's motion for summary judgment and deny Trujillo's motion for summary judgment on his § 1983 claim against Mayerstein.

Both parties moved for summary judgment on this claim.  The United States Court of Appeals for the Tenth Circuit has explained:

> It is . . . settled doctrine that the fact that both parties have moved for summary judgment does not permit the entry of a summary judgment if disputes remain as to material facts.  However, cross motions for summary judgments do authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties.

---

[1] The Court entered an Order denying Trujillo's motion for summary judgment on January 14, 2004 (Doc. 107).  The purpose of this memorandum is to explain its reasoning for its decision reflected in that Order and in the Court's oral ruling on Trujillo's motion.  It is also to explain the Court's ruling on Mayerstein's motion.

[2] Trujillo filed, briefed, and argued this motion when an attorney, Dennis W. Montoya, represented him.  On January 27, 2004, however, Trujillo entered an appearance to proceed *pro se*. See Entry of Appearance (Doc. 109).  Montoya filed an unopposed motion to withdraw on February 3, 2004, see Doc. 110, which the Court granted,  see Order, filed February 4, 2004 (Doc. 111).

Harrison W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir. 1981)(citations omitted).  See Sec. & Exch. Comm'n v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1366 (10th Cir. 1976)("[F]iling of cross-motions under Rule 56, F. R. Civ. P. raises the inference that there is no evidence other than the pleadings and supporting instruments to be considered, and so the trial court need only examine those materials in ascertaining whether an issue of material fact exists.").

## BACKGROUND

As an initial matter, the Court, as it prepared this Opinion, noted that there are facts contained in the record which neither party discussed in their briefing on this motion or at the hearing.  The Tenth Circuit has recently held: "Without a specific reference, [the court] will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." Chavez v. New Mexico, 397 F.3d 826, 839 (10th Cir. 2005)(quotation omitted). Accord Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992)(explaining that searching the appellate record for "dormant evidence . . . would not be fair to either the movant or the district court"); Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001)(holding that, while a district court has discretion to consider other materials in the record, it has no obligation to do so "where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found"); Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996)(holding that the district court has no affirmative obligation to "plumb the record" to procure material facts). "The district court has discretion to go beyond the referenced portions of these materials, but is not required to do so.  If the rule were otherwise, the workload of the district courts would be insurmountable and summary judgment would rarely be granted." Adler v. Wal-

Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998)(citation omitted).  The courts, however, "have a limited and neutral role in the adversarial process, and [the courts should be] wary of becoming advocates who comb through the record . . . and make a party's case for it."  Id.  According to the Tenth Circuit,

> the nonmovant must carry its burden in the district court in a timely fashion pursuant to Rule 56(e) and *Celotex* or explain why it cannot pursuant to Rule 56(f).  Otherwise, the nonmovant acts, or fails to act, at its peril.  The burden is not an onerous one for the nonmoving party in each case, but does not at any point shift from the nonmovant to the district court.

Id. (citations omitted).

### 1.    **Introduction.**

Trujillo honorably retired from the United States Air Force after 26 years of service.  See Deposition of Transito Trujillo at 399:13-15 (taken July 7, 2003)(hereinafter "Trujillo Depo.").  Thereafter, in 1991, the Albuquerque Public Schools ("APS") hired Trujillo at Valley High School ("VHS") as Aerospace Science Instructor ("ASI") in the Air Force Junior Reserve Officers' Training Corps ("AFJROTC") program.  See id. at 407:17-19.

### 2.    **Lourdes Trujillo's EEOC Charge.**

Colonel Richardson Crook was Trujillo's supervisor at VHS.  See Affidavit of Col. Mark Mayerstein ¶ 8, at 2 (executed October 9, 2003)(hereinafter "Mayerstein Aff., October 9, 2003").  On March 15, 2001, APS hired Mayerstein, a retired United States Air Force Lieutenant Colonel, to replace Crook as a JROTC Senior ASI at VHS.  See Letter from John Miera to MSGT Vasser, at 1(dated March 15, 2001).  Trujillo's wife, Major Lourdes Trujillo ("Lourdes"),[3] is a retired Airforce

---

[3] For clarity and consistency, the Court will refer to Lourdes Trujillo as "Lourdes" and Transito Trujillo as "Trujillo" throughout its opinion.

Major who did volunteer work with Trujillo's unit.  See Deposition of Lourdes Trujillo at 154:17-18 (taken June 4, 2003); id. at 166:17-21.  Lourdes alleges that she applied, but was not hired, for the position which APS hired Mayerstein and, in response, filed an Equal Employment Opportunity Commission ("EEOC") complaint on June 1, 2001, alleging discrimination based on national origin and sex.  See EEOC Charge of Discrimination at 1, dated June 1, 2001.  Trujillo alleges that he openly supported Lourdes in the EEOC process and as she prepared to litigate the issue.  See Affidavit of Transito Trujillo ¶ 12, at 5 (executed October 26, 2003)(hereinafter "Trujillo Aff., October 26, 2003"); Affidavit of Transito Trujillo ¶ 30, at 12 (executed August 27, 2003)(hereinafter "Trujillo Aff., August 27, 2003").

Mayerstein's official start date with APS was October 1, 2001.  See Letter from John Miera to MSGT Vasser, at 1.  In June 2001, Mayerstein learned that Lourdes filed a lawsuit against APS. See Mayerstein Aff., October 9, 2003, ¶ 3, at 1.  Mayerstein also contends, however, that he did not know, at that time, that Lourdes had filed an EEOC complaint.  See id.

Mayerstein first met Trujillo in late September 2001, shortly before Mayerstein's official start date.  See Trujillo Depo. at 418:17-24.  Despite that Lourdes was suing APS over the job for which APS hired Mayerstein,  Trujillo felt that he and Mayerstein could work together.  See id. at 419:6-10. At their first meeting, Trujillo and Mayerstein cleared the air, see id. at 419:21-25; id. at 420:1, and, thereafter, began to have a good working relationship, see id. at 420:12-21.  Trujillo believed he and Mayerstein got along well, and Trujillo appreciated Mayerstein's new ideas.  See id. at 421:1-14.  In addition, Mayerstein and Trujillo attended hockey games together with their children.  See id. at 420:23-24.

During October and November of 2001, Trujillo felt he could disagree with Mayerstein and,

upon doing so, Mayerstein was open to suggestions.  See id. at 421:20-24.  In December of 2001,

however, Trujillo believed that Mayerstein was less willing to listen to Trujillo's suggestions, began

joking with Trujillo less, and became less friendly with Trujillo.  See id. at 423:13-24; id. at 424:5-15.

### 3.      Lourdes' Letter.

Trujillo alleges that Mayerstein retaliated against him because Lourdes sent a letter to APS

alleging that Mayerstein was not qualified to teach a particular course.  On December 10, 2001,

Lourdes wrote a letter to the Board of Education asserting that Mayerstein was teaching the ROTC

Private Pilot Ground School course without the proper certification.  See Letter from Lourdes E.

Trujillo to Albuquerque Public Schools Board of Education at 1 (dated December 10, 2001).[4]

Mayerstein admits that he was aware of Lourdes' letter.  See Affidavit of Col. Mark Mayerstein ¶ 3,

at 1 (October 24, 2003)(hereinafter "Mayerstein Aff., October 24, 2003").[5]

---

[4] In his Undisputed Material Facts ("UMF"), paragraph 15, Mayerstein refers to Lourdes' letter to APS as being dated "December 10, 2000."  The letter, however, is dated 2001, and all references to the letter comport with the date of "December 10, 2001."  The Court, therefore, assumes that Mayerstein's reference to the letter's date in paragraph is a typographical error.

[5] Mayerstein, however, denies stating to Lourdes that Trujillo should "watch his six o'clock," a flying term indicating he should watch his back.  See Mayerstein Aff., October 24, 2003, ¶ 3, at 1; Trujillo Depo. at 434:5-9.  The only evidence of this alleged statement is in Trujillo's deposition, in which he testifies about an alleged conversation between Lourdes and Mayerstein.  See Trujillo Depo. at  433:15 - 435:20.  According to Trujillo, Lourdes told him that she had a conversation with Mayerstein about her letter to APS, and Mayerstein told her that he could have Trujillo fired and that Trujillo should watch his 6:00.  See id. at 434:5-9.  Although Mayerstein denies this conversation occurred, or that he ever told Lourdes that Trujillo should watch his 6:00, see Mayerstein Aff., October 24, 2003, ¶3,  at 1, the Court need not consider, assuming the conversation took place, the impact of Mayerstein's alleged threats because the statements are inadmissible hearsay.  The only evidence supporting these statements is Trujillo's testimony about what Lourdes told him about her conversation with Mayerstein.  Mayerstein's comments to Lourdes might be a party opponent's admission and, therefore admissible as nonhearsay.  See Fed. R. Evid. 801(d)(2).  The state of mind exception under rule 803(3) of the Federal Rules of Evidence might also get in the statement if Lourdes' were to testify; however, these statements are not offered to show that Mayerstein was aware of the Letter.  Mayerstein admits as much in his affidavit.  The only reason for offering the

According to Mayerstein, he was qualified to teach the ROTC Ground School course, for high school credit only, because he was a career navigator in the United States Air Force. See Mayerstein Aff., October 9, 2003, ¶ 4, at 2.  Mayerstein admits that, because he was not Federal Aviation Administration ("FAA") certified to teach the course, any ROTC students that took the class would not be able to apply the class towards completion of a private pilot's license.  See id. ¶ 5, at 2. Mayerstein, however, did not have a concern about the FAA certification, because the course was offered only for high school credit and not for the purposes of preparing ROTC students for obtaining their pilot's license or for receiving honors credit.  See id. ¶ 6, at 2.

Trujillo, however, disputes Mayerstein's qualification for teaching the course, alleging that the Ground School course was designed as a preparatory course for students interested in taking the FAA written examination.  In support of his contention, Trujillo offers the "Honors Ground School Program Policy," which states, in part: "Upon course completion, the student must be eligible to take the [FAA] written exam per requirement for the Federal Aviation Regulations FAR 61-05."  Honors Ground School Program Policy, at 5.

In his affidavit, Trujillo states: "After these occurrences, Mayerstein's attitude toward me changed.  He moved my office and personal belongings without my knowledge and consent and put me in [a] small storage room.  He took me out of the chain of command with cadets.  He changed my working hours to start at 6 in the morning and end at 5 in the afternoon on certain days.  He

_____

statements about being able to fire Trujillo and that Trujillo should watch his back seems to be for the truth of the matter asserted -- that Mayerstein threatened Trujillo after hearing about Lourdes' letter.  In any case, because Trujillo rather than Lourdes is testifying to this statement, Trujillo's conversation with Lourdes about these statements are inadmissible hearsay.  See Starr v. Pearl Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995)("Rule 56 precludes the use of inadmissible hearsay testimony in depositions in support of, or in opposition to, summary judgment.").

micromanage[d] everything I did []. He demeaned and belittled me in every way he could." Trujillo Aff., October 26, 2003, ¶ 21, at 7-8.[6]

### 4.   **Trujillo Reporting "Student Abuses."**

In December 2001, Trujillo reported to Griego and to Bruce Smith, VHS' assistant principal, that Mayerstein committed "student abuses." See Trujillo Depo. at 431:5-7; id. at 431:14-16; Trujillo Aff., August 27, 2003, ¶ 10, at 5. Trujillo contends that the "abuses" consisted of: (i) calling students "losers;" (ii) throwing a student's books in a trash can; and (iii) telling one of his students that, if he joined a gang, he would go to prison and be raped. Trujillo Depo. at 426:9-22; Mayerstein Aff., October 9, 2003, ¶ 12-14, at 3. There is nothing in the record, however, indicating that anyone -- including Trujillo, Griego, or Smith -- informed Mayerstein about Trujillo's report of Mayerstein's conduct to Griego and Smith.

Mayerstein admits that, on occasion, he did not demonstrate maturity or professional judgment, but, in such instances, he took steps to rectify and to learn from the situation. See Mayerstein Aff., October 24, 2003, ¶ 4, at 2. He denies humiliating, threatening, or intimidating students. See id. ¶ 5, at 2. Mayerstein contends that each statement he made, although arguably harsh, was in response to a parent's request that Mayerstein become personally involved with the

---

[6] Trujillo does not specify to which occurrences he is referring, but, at that point in his affidavit, Trujillo had only described Lourdes' EEOC complaint, his speaking to Griego about Mayerstein's qualifications, and Lourdes' letter. Trujillo does not mention these actions by Mayerstein in connection with Trujillo reporting Mayerstein's treatment of students.

Also, Trujillo did not list these alleged adverse employment actions in his UMF to his motion for summary judgment, or in response to Mayerstein's motion for summary judgment. At the hearing on these motions, however, Trujillo's counsel did refer to Trujillo's affidavit containing these facts, and read a portion of paragraph 21 of Trujillo's October 26, 2003, affidavit. See Transcript of Hearing at 93:5-13; id. at 120:13-18.

particular student.  See id.  Mayerstein contends that his goal was to not only instill pride and discipline in the students, but also to help the students with personal and family problems.  See Mayerstein Aff., October 9, 2003, ¶ 11, at 3.

**5.      Trujillo's Job Performance.**

Mayerstein alleges that, during his tenure at VHS, he observed that Trujillo was not carrying his full share of the ASI's load.  See Mayerstein's Motion for Summary Judgment ¶ 21, at 5-6; Mayerstein Aff., October 9, 2003, ¶ 7, at 2.  Specifically, Mayerstein alleges that Trujillo did not spend the requisite number of hours at the job, did not use prepared lesson plans for class, neglected to properly order supplies, failed to timely grade students' projects, and did not respond to Mayerstein's request to Trujillo to improve his behavior.  See id.

Trujillo disputes these allegations, contending that Mayerstein has not offered evidence to demonstrate his alleged shortcomings.  Trujillo alleges he adequately performed every duty his position required, see Teacher Evaluation Reports at 1 (dated May 15, 2000, May 27, 1999, May 21, 1998, June 3, 1997, May 18, 1995, April 14, 1994, and May 4, 1993), and was a well-liked and respected faculty member, see Letter from Susan K. Clayton, VHS Librarian, to Whom It May Concern, at 1 (dated September 12, 2002); Certificates of Appreciation (dated May 24, 2001, May 22, 2001, May 9, 2000, May 13, 1999, and May 10, 1999).  Trujillo contends he taught all of his classes, prepared lesson plans, and administered tests and recorded results.  See Trujillo Aff., October 26, 2003, ¶ 25, at 10-11.  Trujillo contends that the incident in which some students had difficulty obtaining complete uniforms was a result of logistical problems as opposed to his own performance.

See Affidavit of Estrella Serna ¶¶ 8-10, at 3 (October 9, 2003).[7]

Mayerstein contends that he spoke with Crook about Trujillo's alleged deficiencies. In this conversation, Mayerstein contends that Crook stated that he worked additional hours to deal with Trujillo's deficiencies. See Mayerstein Aff., October 9, 2003, ¶ 8, at 2. Trujillo disputes this contention, asserting that -- in addition to not being relevant -- his personnel file does not reflect any problems with his job performance. Moreover, Trujillo alleges that Crook's statements are inadmissible hearsay that the Court should disregard.

In November 2001, Mayerstein began to record his observations of Trujillo's alleged deficiencies. See Memorandum for Record by Mayerstein (dated November 6, 2001). The memoranda pertaining to Trujillo's performance were for Mayerstein's "own file," Mayerstein Aff., October 9, 2003, ¶ 9, at 2, and there is no evidence that the memoranda were distributed to others and, if so, to whom. Because Mayerstein kept these observations in his personal file, Trujillo challenges their authenticity and accuracy. Trujillo contends that, instead of establishing the veracity of Mayerstein's observations, this detailed log indicates Mayerstein was engaged in a "witch-hunt" against Trujillo. Plaintiff's Response at 4-5.

Mayerstein alleges that -- although he spoke with Trujillo several times about the alleged deficiencies in his work performance -- Trujillo was not written up or officially counseled until March 20, 2002. See Mayerstein Aff., October 9, 2003, at ¶ 9, at 2. According to Mayerstein, the

---

[7] In his response to Mayerstein's motion, Trujillo disputes Mayerstein's criticisms of his work performance, and, in support of his assertion, refers generally to his October 26, 2003, affidavit. See Plaintiff's Response to Defendant Mayerstein's Motion for Summary Judgment on the Basis of Qualified Immunity at 3, filed October 27, 2003 (Doc. 80)(hereinafter "Plaintiff's Response"). Trujillo, however, does not cite with particularity to any portion or paragraph of his affidavit to support this assertion.

counseling session was based solely on Trujillo's deficient job performance and not in retaliation against Trujillo for any alleged protected activity.  See id. ¶ 10, at 3.  Trujillo disputes this allegation, contending that Mayerstein's "retaliatory motive" is apparent from the "totality of the circumstances." Plaintiff's Response at 5-6.

On March 20, 2002, Mayerstein issued a Record of Counseling to Trujillo.  See Record of Counseling at 1, dated March 20, 2002.  In this document, Mayerstein "counseled" Trujillo "[a]s a direct result of [Trujillo's] poor performance/attendance the first six months of the 2001-2002 school year," citing Trujillo's not working the requisite number of hours, failing to arrange sufficient uniforms for the cadets, and not "teach[ing] a planned and cohesive curriculum."  Id.  Trujillo filed a rebuttal to this record of counseling on April 7, 2002, alleging that Mayerstein issued the Record of Counseling in response to Trujillo reporting the student "abuses" and for supporting Lourdes' charges that Mayerstein was teaching a class for which he is not qualified to teach.  Trujillo Aff., October 26, 2003, ¶ 27, at 12.[8]  Trujillo does not offer, however, any other evidence indicating that Mayerstein knew of Trujillo's complaints to Griego and Smith.  See Transcript of Hearing at 91:12-92:4.[9]

### 6.    The "Armory Incident."

On March 21, 2002, Mayerstein wrote a "memorandum for record," stating that a parent informed him that, "two years ago . . . , Trujillo was caught (by three cadets) having sex in the

---

[8] Trujillo did not list this fact in his UMF to his motion for summary judgment, or in response to Mayerstein's motion for summary judgment.  At the hearing on these motions, however, Trujillo's counsel did refer to the portion of Trujillo's affidavit containing this fact.  See Transcript of Hearing at 91:23- 92:4.

[9] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page or line numbers.

Armory with the mother of another cadet[, Patricia Vreeke]."  Memorandum for Record at 1 (dated March 21, 2002).[10]  See Letter from Patricia Vreeke at 1 (dated July 18, 2002)(denying the accusations of having had an affair with Trujillo)(attached to APS, Vigil, Peck, Griego, Smith and William's Motion for Summary Judgment).  Mayerstein also wrote another "memorandum for record," dated April 2, 2002, discussing "The Armory Incident."  Memorandum for Record at 1 (dated April 2, 2002).[11]

On April 23, 2002, Mayerstein sent Griego a letter, indicating that the "statements by certain individuals that . . . Trujillo had sex in the Armory with a Cadet's mother are not now credible in my estimation. . . . I request that any reference to this alleged act be stricken from any written references in . . . Trujillo's record."  Letter from Mayerstein to Trujillo at 1 (dated April 23, 2002).  See Letter from Mayerstein to Griego at 1 (dated April 22, 2002).

### 7.  Letter of Understanding.

On April 11, 2002, Trujillo received a Letter of Understanding from Smith, indicating that his actions, including not following the proper military and APS rules and regulations and not signing out before leaving campus, were "detrimental to the educational environment at [VHS]" and that, "[i]f these actions continue[d, Trujillo] could face disciplinary actions."  Letter of Understanding from

---

[10] This fact is not listed in Trujillo's response to Mayerstein's UMF, but instead appears in the argument portion of the brief.  Because Trujillo provides a cite to the record supporting this fact, however, the Court include it in its discussion.

[11] As with the memoranda documenting Trujillo's performance, it is not clear from the record whether Mayerstein distributed all of the memoranda detailing the armory incident.  The April 22, 2002, and April 23, 2002, memoranda, however, indicate that they were sent to Griego.  It is clear, however, that Trujillo and others were aware of Mayerstein's allegations regarding the armory incident.  See Letter from Patricia Vreeke at 1 (dated July 18, 2002); Letter from Trujillo to Griego at 1 (dated April 5, 2002)(expressing anger over Mayerstein's accusation of having been caught having sex in the armory).

Smith to Trujillo at 1 (dated April 11, 2002).[12]  Mayerstein alleges that he did not write this letter.
See Mayerstein Aff., October 24, 2003, ¶ 7, at 2.

On April 29, 2002, Ron Williams, Director of APS, placed Trujillo on administrative leave
"pending an investigation of allegations that [Trujillo had] created a hostile educational environment
at [VHS]."  Letter from Williams to Trujillo at 1 (dated April 29, 2002).[13]  According to Mayerstein,
he was not responsible for placing Trujillo on administrative leave, nor did he have the power to do
so.  See Mayerstein Aff., October 24, 2003, ¶ 6, at 2.

In his reply, Trujillo concedes that the Letter of Understanding and being placed on
administrative leave "do not relate to actions taken by Defendant Mayerstein.  They were only
included in Plaintiff's Memorandum . . . to create a complete record for the Court."  Plaintiff's Reply
to Defendant Mayerstein's Response to Plaintiff's Motion for Partial Summary Judgment at  4, filed
November 13, 2003 (Doc. 89).[14]

Trujillo brought claims against the individual Defendants in their individual capacities under
§ 1983 and § 1985.  See Complaint ¶¶ 86-99, at 28-30.  Trujillo has abandoned any claims under §
1985 and now proceeds solely under § 1983 against the individual Defendants.  See Transcript of

---

[12] Mayerstein received a Letter of Reprimand on April 19, 2002, stating that his "conduct, as
an employee of [APS] is not at an appropriate level."  Letter of Reprimand from Smith to Mayerstein
at 1 (dated April 19, 2002).

[13] Williams also placed Mayerstein on administrative leave the same day.  See Letter of
Williams to Mayerstein at 1 (dated April 29, 2002).

[14] The Court notes that, in the first paragraph of his Reply, Trujillo refers "to Defendant's
Response to Plaintiff's Partial Summary Judgment against Defendant Albuquerque Public Schools
in regards to the Title VII Retaliation claim raised by the Plaintiff in Count II of his Complaint."
Reply at 1.  Based on the caption of Trujillo's motion, as well as the substance, the Court finds that
Trujillo made the reference to the Title VII claim against APS in error, and that the reply is to
Mayerstein's response.  The Court will therefore consider the reply in conjunction with this motion.

Hearing at 25:9-16.

## STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To avoid summary judgment, the non-moving party must contradict facts that the movant specifically avers. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. at 323. The moving party can meet this burden by highlighting to the court an insufficiency of evidence as to an essential element of the nonmovant's claim. See id. Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citations omitted; citing Celotex Corp. v. Catrett, 477 U.S. at 324). The non-moving party "must go beyond the pleadings and identify specific facts which demonstrate the existence of an issue to be tried by the jury." Martinez v. Am. Oil & Supply Co., No. 99-2228, 2000 WL 807247, at **3 (10th Cir. June 23, 2000)(unpublished decision).

For the purposes of summary judgment, the court assumes the non-moving party's evidence to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff," the court should deny summary judgment. MacDonald v. E. Wyo. Mental Health Ctr.,

941 F.2d 1115, 1121 (10th Cir. 1991)(quoting Palucki v. Sears, Roebuck & Co., 879 F.2d 1568,

1570 (7th Cir. 1989)(quotation omitted)).

The court should, however, grant summary judgment "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c).  A factual dispute is "material" if it "might affect the outcome of the suit

under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  A "genuine" factual

dispute requires the non-moving party to show more than a mere scintilla of evidence to overcome

a motion for summary judgment. Id. at 252.

The court may grant summary judgment "if the non-moving party's evidence is merely

colorable[] or is not significantly probative." Id. at 250-51 (citations omitted).  "In a response to a

motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on

suspicion and may not escape summary judgment in the mere hope that something will turn up at

trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at

251-52.

## LAW ON QUALIFIED IMMUNITY

Qualified immunity protects government officials performing discretionary functions from

liability for civil damages "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Tonkovich v. Kan. Bd. of

Regents, 159 F.3d 504, 516 (10th Cir. 1998)(quoting Ramirez v. Okla. Dep't of Mental Health, 41

F.3d 584, 592 (10th Cir. 1994), and Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  See Hunter

v. Bryant, 502 U.S. 224, 227 (1991)(per curiam); Siegert v. Gilley, 500 U.S. 226, 231-33 (1991).

By protecting officials from suits based on reasonable error, the qualified immunity doctrine prevents

government officials from always having to err on the side of caution if they wish to avoid being sued.

See Hunter v. Bryant, 502 U.S. at 229; Davis v. Scherer, 468 U.S. 183, 196 (1984).  Once the

defendant raises the qualified immunity defense, the plaintiff bears the burden of showing that the

federal rights allegedly violated were clearly established at the time of the alleged violation.  See

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Furnace v. Okla. Corp. Comm'n, 51 F.3d 932, 936

(10th Cir. 1995).

Deciding the qualified immunity issue requires a two-part analysis.  See Tonkovich v. Kan.

Bd. of Regents, 159 F.3d at 516.  First, the court must determine whether the plaintiff has sufficiently

alleged that the defendant violated a constitutional right.  See id. ("A necessary concomitant to the

determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the

time the defendant acted is the determination of whether the plaintiff has asserted a violation of a

constitutional right at all.")(citing Siegert v. Gilley, 500 U.S. at 232).  Second, if the court decides

that the plaintiff has asserted a violation of a constitutional right, the court must "determine whether

the right was clearly established such that a reasonable person in the defendant's position would have

known that his or her conduct violated that right."  See Tonkovich v. Kan. Bd. of Regents, 159 F.3d

at 516.

**I.       THE FIRST PRONG OF THE QUALIFIED IMMUNITY ANALYSIS: VIOLATION OF A CONSTITUTIONAL RIGHT.**

**A.       FIRST AMENDMENT RETALIATION.**

"A government employer cannot 'condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" Lybrook v. Members of the Farmington Mun. Schs. Bd. of Educ., 232 F.3d 1334, 1338 (10th Cir. 2000)(quoting Connick v. Myers, 461 U.S. 138, 142 (1983)).  Accordingly, "a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." Dill v. City of Edmond, 155 F.3d 1193, 1201 (10th Cir. 1998).

At the Supreme Court for the United States' direction, the United States Court of Appeals for the Tenth Circuit employs a multi-tier analysis, known as the Pickering test, to evaluate whether a public employer's actions impermissibly infringe on an employee's free speech rights. See Connick v. Meyers, 461 U.S. at 146; Martin v. City of Del City, 179 F.3d 882, 886 (10th Cir. 1999)(citing Schalk v. Gallemore, 906 F.2d 491, 494 (10th Cir. 1990)).  First, the court must decide "whether the speech is protected, i.e., on a matter of public concern." Hulen v. Yates, 322 F.3d 1229, 1237 (10th Cir. 2003).  If so, the court must balance the employee's interest in making the statement against the public employer's interest "in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).  If the preceding prerequisites are met, the speech is protected, and the plaintiff must show his or her expression was a motivating factor in the detrimental or adverse employment decision. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Hulen v. Yates, 322 F.3d at 1237.  Finally, if the plaintiff sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same adverse employment action regardless of the protected speech. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287; Hulen v. Yates, 322 F.3d at 1237.  The first two questions of the  Pickering test are questions of law, while the latter two are questions of fact.

See Aiken v. Rio Arriba Bd. of County Comm'rs, 134 F. Supp. 2d 1216, 1219 (D.N.M. 2000)(Black, J.)(citing Barker v. City of Del City, 215 F.3d 1134, 1138-39 (10th Cir. 2000)).

To determine whether speech touches on a matter of public concern, the Court must determine whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Meyers, 461 U.S. at 146. This examination requires analysis of the "content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. In examining the context in which the speech occurred, the Tenth Circuit noted that the Supreme Court, in Connick v. Meyers, "viewed the employee's speech (the questionnaire) as essentially growing out of and as merely an extension of an underlying employment dispute." Koch v. City of Hutchinson, 847 F.2d 1436, 1446-47 (10th Cir. 1988)(en banc).

"An employee's motivation for speaking is important to our analysis of whether the speech pertained to matters of public concern." Baca v. Sklar, 398 F.3d 1210, 1219 (10th Cir. 2005).

> In analyzing whether speech constitutes a matter of public concern, [the court] may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest. For example, when the identified speech focuses on disclosing a public official's malfeasance or wrongdoing, it is most likely a matter of public concern. Conversely, it 'is generally not [considered] protected speech if [its] aim is simply to air grievances of a purely personal nature.'

Lighton v. Univ. of Utah, 209 F.3d 213, 1224-25 (10th Cir. 2000)(quoting Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir.1990))(citations omitted). Accord Hulen v. Yates, 322 F.3d at 1237 ("[The courts] also consider the motive of the speaker--was the speech calculated to redress personal grievances or did it have a broader public purpose?")(quotation and alterations omitted). It is not sufficient that the speech topic is of general interest to the public; rather, the actual statements on that particular topic must be of public concern. See Wilson v. City of Littleton, 732 F.2d 765, 769 (10th

Cir. 1984).  Courts have stated that, when the speech's content focuses on disclosing public officials' malfeasance or wrongdoing, it is likely to be considered a matter of public concern.  See Lighton v. Univ. of Utah, 209 F.3d at 1224-25; Wulf v. City of Wichita, 883 F.2d 842, 857 (10th Cir. 1989); Koch v. City of Hutchinson, 847 F.2d at 1445 ("[M]any courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties.").

The Supreme Court, in Connick v. Meyers, noted that an employee has a "right to protest racial discrimination -- a matter inherently of public concern --" when the "employee speaks out as a citizen on a matter of general concern, not tied to a personal employment dispute, but arranges to do so privately." Connick v. Meyers, 461 U.S. at 148 n.8 (citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415-416 (1979)).  In Patrick v. Miller, 953 F.2d 1240 (10th Cir. 1992), the Tenth Circuit addressed whether an employee's "statements in opposition to discriminatory employment practices" towards another employee were a matter of public concern.  Id. at 1246-47. In reaching its conclusion that the employee's speech involved a matter of public concern, the Tenth Circuit explained that the employee's speech did not "address[] concerns relating to employment practices which affected him directly.  Rather, he was speaking in support of other employees." Id. at 1247.  The Tenth Circuit concluded that the employee's "statements cannot be characterized simply as a personal grievance or an internal personnel matter.  The disclosure and attempted remediation of racially discriminatory employment practices is better characterized as a matter of social concern to the community." Id.

In Rankin v. Independent School District No. I-3, Noble County, Oklahoma, 876 F.2d 838

(10th Cir. 1989), the Tenth Circuit addressed the protection afforded a teacher's public speech on

the school's disciplinary methods for its students:

> The parties and the district court agreed that the issue of student discipline was a
> matter of public concern in the District during the relevant period.  "There exist few
> questions within the area of education which are of more interest to the public than
> the one which raises the possibility of the physical mistreatment of students in the
> community schools."  Bowman v. Pulaski Cty. Special Sch[.] Dist., 723 F.2d 640,
> 644 (8th Cir. 1983).  However, plaintiff must also present evidence that his speech,
> by its content, form and context, was itself of general interest rather than of purely
> personal concern.  See Saye [v. St. Vrain Valley Sch. Dist. RE-IJ], 785 F.2d [862,]
> 866 [(10th Cir. 1986)]; Wren v. Spurlock, 798 F.2d 1313, 1317-18 & n.1 (10th Cir.
> 1986), cert. denied, 479 U.S. 1085 . . . (1987); Wilson v. City of Littleton, 732 F.2d
> 765, 768-69 (10th Cir. 1984).  [The plaintiff] met this burden with evidence that his
> speech was made publicly to parents and at school board meetings, that the speech
> occurred at a time of great general interest in the District's discipline policy and in the
> context of a public debate on the issue, and that the content of his speech contributed
> to that debate.  See Bowman [v. Pulaski County. Special Sch. Dist.], 723 F.2d at
> 644-45.

Rankin v. Indep. Sch. Dist. No. I-3, Noble County, Okla., 876 F.2d at 843.

The second step of the Pickering test for First Amendment retaliation is to balance the

competing interests of the employee and the employer:

> *Pickering* directs us to consider a number of factors in balancing the competing
> interests at stake.  "[T]he manner, time, and place of the employee's expression are
> relevant, as is the context in which the dispute arose."  Pertinent considerations
> include "whether the statement impairs discipline by superiors or harmony among
> coworkers, has a detrimental impact on close working relationships for which
> personal loyalty and confidence are necessary, or impedes the performance of the
> speaker's duties or interferes with the regular operation of the enterprise."

Wulf v. City of Wichita, 883 F.2d at 861 (quoting Rankin v. McPherson, 483 U.S. 378, 388

(1987))(internal citations omitted).

If the employee's interest outweighs the employer's, the Pickering test's third step requires

the employee "to establish a 'causal connection[]' [by showing] that engaging in the protected activity

was a substantial or motivating factor in the adverse employment action." Grady v. Shawnee Pub.
Sch. Dist. I-93, No. 98-6099, 1998 WL 852533, at *5 (10th Cir. Dec. 10, 1998)(unpublished
decision)(citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287). "[E]mployers'
acts short of dismissal may be actionable as First Amendment violations, [however the Tenth Circuit
has] never ruled that *all* such acts, no matter how trivial, are sufficient to support a retaliation claim.
. . .   [T]here may be some minor adverse actions that would not constitute First Amendment
violations." Lybrook v. Members of the Farmington Mun. Schs. Bd. of Educ., 232 F.3d at 1340
(internal citations and quotations omitted)(holding that placing a teacher on a "Professional
Development Plan," which required the teacher to strive to create a collaborative atmosphere and act
with high professional standards, did not constitute an adverse employment action for purposes of
First Amendment retaliation).

"An employee alleging retaliation must show that his employer took some adverse
employment action against him." Baca v. Sklar, 398 F.3d at 1220.  As the Tenth Circuit stated in
Belcher v. City of McAlester, Oklahoma:

> Implicit in the *Pickering* test is a requirement that the public employer have taken
> some adverse employment action against the employee. *See Koch v. City of
> Hutchinson*, 847 F.2d [at] . . . 1440 . . . (noting that *Pickering* and its progeny
> 'establish the basic framework for analyzing a claim by a public employee that his or
> her governmental employer made an *adverse employment decision* in violation of the
> employee's First Amendment rights" (emphasis added)).  If the action taken by the
> employer in response to the employee's speech is inconsequential or has only
> speculative consequences, there can be no basis for a First Amendment claim.

324 F.3d 1203, 1207 n.4 (10th Cir. 2003).  In Baca v. Sklar, the Tenth Circuit recognized that it
"ha[s] never delineated what actions constitute 'adverse employment actions' in the First Amendment
context,"  but then explained that it "ha[s] repeatedly concluded that a public employer can violate

-21-

an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII." 398 F.3d at 1220 (citing Morfin v. Albuquerque Pub. Sch., 906 F.2d 1434, 1437 n.3 (10th Cir. 1990)("rejecting proposition that 'only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal. Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment.'"); Schuler v. City of Boulder, 189 F.3d 1304, 1310 (10th Cir.1999)("reprimanding employee, transferring her to another location, and removing job duties from her constitute adverse employment actions in First Amendment context")).[15] In Baca v. Sklar, the Tenth Circuit held that the following actions, if true, could amount to adverse employment actions for First Amendment retaliation purposes: "removing [the plaintiff's] supervisory responsibilities" over another employee, "encouraging [other] employees to bypass [the plaintiff] and receive direct

---

[15] In so holding, the Tenth Circuit aligned with the First Circuit and the Ninth Circuit, which have held that First Amendment retaliation adverse employment actions are subject to a lower standard than Title VII claims. See Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004)("[T]he standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII)."); Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003)("To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind."). See also Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)(holding that "lesser actions [than discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand] may also be considered adverse employment actions" in the First Amendment retaliation context) The Eleventh Circuit, on the other hand, explained that, although the court has "not explicitly equated [the First Amendment retaliation's adverse employment action] element with Title VII's adverse employment action requirement, [the Eleventh Circuit] regularly draw[s] cases applying this rule to inform our analysis of Title VII retaliation claims. . . . This is because the standards are consonant." Stavropoulos v. Firestone, 361 F.3d 610, 619-20 (11th Cir. 2004)(concluding that "the district court committed no error by applying Title VII standards of what is an adverse employment action to [the plaintiff's] First Amendment retaliation claim"). See also Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir. 2000)(explaining that, in this First Amendment retaliation context, the Fifth Circuit "has declined to expand the list of actionable actions [beyond discharges, demotions, refusals to hire, refusals to promote, and reprimands] . . . to ensure that § 1983 does not enmesh federal courts in relatively trial matters." (citations and quotations omitted)).

supervision from [the defendant], reprimanding [the plaintiff] in contravention of [the employer's]

protocol, and filing a . . . charge [with the employer's Office of Equal Opportunity] against [the

plaintiff] and then using that charge to demand [the plaintiff's] resignation." Id.

The Tenth Circuit has not definitively decided whether a public employer's disparaging

comments about an employee is sufficient to violate an employee's First Amendment rights.  As the

Tenth Circuit explained in the context of reviewing for plain error a jury instruction allowing a First

Amendment retaliation claim based on disparaging comments:

> [The Tenth Circuit has] never found a First Amendment violation on the basis of
> disparaging comments alone.  The defendants cite our decision in Lybrook v.
> Members of the Farmington Municipal School Board, 232 F.3d 1334 (10th Cir.
> 2000), for the proposition that while "employers' acts short of dismissal may be
> actionable as First Amendment violations, [the Tenth Circuit has] never ruled that all
> such acts, no matter how trivial, are sufficient to support a retaliation claim." Id. at
> 1340.  They also rely heavily on our decision in Phelan v. Laramie County Community
> College Board of Trustees, 235 F.3d 1243 (10th Cir. 2000), in which [the Tenth
> Circuit] held that the censuring of a member of the college's board of trustees did not
> violate the board member's First Amendment rights.  Id. at 1248-49.  Defendants
> interpret Phelan as holding that "an action will only trigger First Amendment concerns
> if it carries consequences that infringe protected speech." . . .
>
> Decisions of other circuit courts fall on both sides of this issue.  The Seventh Circuit
> has held that a "campaign of petty harassments" can constitute a violation of the First
> Amendment, noting that "[t]he effect on freedom of speech may be small, but since
> there is no justification for harassing people for exercising their constitutional rights
> it need not be great in order to be actionable." Bart v. Telford, 677 F.2d 622, 625
> (7th Cir. 1982); see also Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir. 1989)
> ("Harassment of a public employee for his political beliefs violates the First
> Amendment unless the harassment is so trivial that a person of ordinary firmness
> would not be deterred from holding or expressing those beliefs.").  Yet several
> circuits have declined to find a First Amendment violation on the basis of disparaging
> statements or verbal reprimands. See Suarez Corp. Indus. v. McGraw, 202 F.3d 676,
> 687 (4th Cir. 2000)(collecting cases); Benningfield v. City of Houston, 157 F.3d 369,
> 376 (5th Cir. 1998)("[M]ere accusations, without more, are not adverse employment
> actions.").

Given the ambiguity in the case law, it is not certain that the [public employer's]

disparaging comments actually violated [the plaintiff's] First Amendment rights.  As there is some support for both sides of this issue, however, it is not "clear or obvious under current law," [United States v.] Ruiz-Gea, 340 F.3d [1181,] 1185 [(10th Cir. 2003)], that [the jury instruction] was in error.

Hardeman v. City of Albuquerque, 377 F.3d 1106, 1118-19 (10th Cir. 2004).

The plaintiff must also establish that his speech was a substantially motivating factor in the employer's decision.  See Mt. Healthy City Sch. Dis. v. Doyle, 429 U.S. at 287; Baca v. Sklar, 398 F.3d at 1221 (noting that the defendant "began a pattern of retaliation" within one week of the plaintiff's protected activity).  Temporal proximity alone, however, is not sufficient to establish that protected speech was a substantially motivating factor in an employer's adverse employment decision.  See Butler v. City of Prairie Village, Kan., 172 F.3d 736, 746 (10th Cir. 1999)("Plaintiff has not established that the speech was a motivating factor in his termination.  The mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive.")(citing Marx v.  Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996); Love v. Re/Max of Am., Inc., 738 F.2d 383, 386 (10th Cir. 1984)).  The Tenth Circuit recently stated that it "ha[s] not clarified what a plaintiff must show beyond temporal proximity to establish a retaliation claim." Baca v. Sklar, 398 F.3d at 1221.  Nevertheless, the Tenth Circuit noted that it "ha[s] considered as relevant whether the protected speech implicated the individual defendant in wrongdoing."  Id.

Finally, even if the plaintiff can show that his speech was a substantially motivating factor in the employment decision made, the employer may still prevail if it can establish that it would have made the same decision in the absence of the plaintiff's speech.  See Mt. Healthy Sch. Dist. v. Doyle, 429 U.S. at 287.  The Tenth Circuit recently explained:

It does not fall to the plaintiff, as the nonmovant on summary judgment, to demonstrate that the defendant would have acted differently absent the plaintiff's

> protected speech.   Once a plaintiff demonstrates that his protected speech
> substantially motivated the employer's adverse action, he has met his burden.  "[T]he
> burden then shifts to the employer to show by a preponderance of the evidence that
> it would have reached the same decision" regardless of the employee's statements.

Baca v. Sklar, 398 F.3d at 1221-22 (quoting Ballard v. Muskogee Reg'l Med. Ctr., 238 F.3d 1250,

1252 (10th Cir.2001)).

## B.    FAMILIAL OR MARITAL ASSOCIATION.

The Tenth Circuit recognized a § 1983 cause of action for familial or marital association in

Trujillo v. Bd. of County Comm'rs of the County of Santa Fe, 768 F.2d 1186, 1189-90 (10th Cir.

1985).  "[A]n allegation of intent to interfere with a particular relationship protected by the freedom

of intimate association is required to state a claim under section 1983."  Id. at 1190.  See Bryson v.

City of Edmond, 905 F.2d 1386, 1394 (10th Cir. 1990)("Nowhere in the complaint is there an

allegation that any claimed acts or omissions, however intentional, occurred with the specific intent

on the part of the defendants to deprive the plaintiffs of their rights of association with the victims.").

## II.    SECOND PRONG OF THE QUALIFIED IMMUNITY ANALYSIS: THE LAW MUST BE CLEARLY ESTABLISHED.

Whether the law was clearly established at the time the claim arose is a legal issue for the

court.  See Elder v. Holloway, 510 U.S. 510, 516 (1994).  For the law to be clearly established,

thereby rendering qualified immunity inapplicable, the law must have earlier been developed in such

a concrete and factually defined context to make it obvious to all reasonable government actors, in

the defendant's place, that what the defendant is doing violates federal law.  See Anderson v.

Creighton, 483 U.S. 635, 640 (1987); Tonkovich v. Kan. Bd. of Regents, 159 F.3d at 516 ("[I]n

order for a plaintiff to demonstrate that a law is clearly established, 'there must be a Supreme Court

or Tenth Circuit decision on point, or the clearly established weight of authority from other courts

must have found the law to be as the plaintiff maintains.'")(quoting Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Because qualified immunity is a doctrine of practical application to real-life situations, the court evaluates the acts of government officials against the law and facts at the time the defendants acted, not with hindsight based on later events. See Hunter v. Bryant, 502 U.S. at 228 ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact."). The defendant's subjective intent plays no part in the qualified immunity analysis. See Anderson v. Creighton, 483 U.S. at 641; Mitchell v. Forsythe, 472 U.S. at 517. The official has immunity from suit unless a public official's act is so obviously wrong in light of preexisting law that only a plainly incompetent official or one who is knowingly violating the law would have done such a thing. See Malley v. Briggs, 475 U.S. 335, 341 (1986). Objective legal reasonableness is the touchstone. See Tonkovich v. Kan. Bd. of Regents, 159 F.3d at 516.

The plaintiff has the significant burden of rebutting the presumption that qualified immunity applies to preclude his claims against the defendant. See Mick v. Brewer, 76 F.3d 1127, 1134 (10th Cir. 1996). In meeting this heavy burden "the plaintiff must do more than simply allege the violation of a general legal precept. The plaintiff must instead demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." Jantz v. Muci, 976 F.2d 623, 627 (10th Cir. 1992)(internal quotation marks and citations omitted). If the plaintiff fails to demonstrate that the unlawfulness of the alleged actions was apparent, the defendant is entitled to judgment based on qualified immunity. See id. at 630.

"It is clearly established that a State may not discharge an employee on a basis that infringes

that employee's constitutionally protected interest in freedom of speech." Patrick v. Miller, 953 F.2d at 1246.

## ANALYSIS

Based on the evidence before the Court in Trujillo's Motion for Summary Judgment as to Plaintiff's § 1983 Claim Against Defendant Mayerstein and Mayerstein's Motion for Summary Judgment, the Court finds that there is no genuine issue of material fact whether Mayerstein retaliated against Trujillo in violation of his First Amendment rights, or whether Mayerstein violated Trujillo's right to marital association. Accordingly, Mayerstein is entitled to qualified immunity and the Court will grant Mayerstein's motion for summary judgment, and deny Trujillo's motion.

Although during the briefing and the oral argument on this motion counsel represented Trujillo, he now proceeds before the Court *pro se*. The Supreme Court has directed lower courts to hold *pro se* litigants' pleadings "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). The *pro se* litigant "nevertheless must follow the same rules of procedure that govern other litigants," Green v. Dorrell, 969 F.2d 915, 917 (10th Cir. 1992), and it is not "the proper function of the district court to assume the role of advocate for the pro se litigant," Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

## I.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT WHETHER MAYERSTEIN VIOLATED TRUJILLO'S FIRST AMENDMENT RIGHTS.

Based on Mayerstein's and Trujillo's representations, the following categories of speech are the possible bases on which Mayerstein unlawfully retaliated against Trujillo: (i) Lourdes' EEOC charge; (ii) Lourdes' letter on Mayerstein's qualifications; and (iii) Trujillo reporting Mayerstein's student abuses. The Court will evaluate each category and determine whether it creates a genuine

issue of material fact that Mayerstein engaged in unlawful First Amendment retaliation against Trujillo.

### A.      LOURDES' EEOC CHARGE.

Lourdes' filing an EEOC charge was not Trujillo's speech, and, therefore, cannot serve as the basis of protected speech for First Amendment retaliation against Trujillo.   Nevertheless, even assuming that, under Owens v. Rush, 654 F.2d 1370, 1379 (10th Cir. 1981), Trujillo has a First Amendment right to assist Lourdes' EEOC charge, Mayerstein asserts that the underlying speech must constitute a matter of public concern to be considered protected speech.   See Transcript of Hearing at 101:10 - 102:7; Lunow v. City of Oklahoma City, 61 Fed. Appx. 598, 605 (10th Cir. Mar. 28, 2003)(unpublished decision)(addressing whether a prior lawsuit under Fair Labor Standards Act constituted a matter of public concern as the first step in the First Amendment retaliation analysis); Tapia v. Beffort, No. CIV 02-513, Memorandum Opinion and Order at 16-17, filed November 26, 2003 (D.N.M.).

Lourdes filed her EEOC charge under Title VII for sex and national origin discrimination arising out of APS' failure to hire her for Crook's position.   Unlike Patrick v. Miller, however, Lourdes' EEOC charge and ensuing lawsuit against APS derived from APS' failure to hire her.   Even though sex and national origin discrimination is an important societal concern, in this context, Lourdes' action against APS, and Trujillo's support of Lourdes in that action,[16] is a "personal

---

[16] The Court also notes that, other than referring generally to his "support of [Lourdes'] EEOC non-selection complaint," Trujillo Aff., August 27, 2003, ¶ 30, at 12, and the conversation with Mayerstein about Lourdes' complaint, Trujillo Aff., October 26, 2003, ¶¶ 11-12, at 4-5, Trujillo does not provide any other specific examples of what actions he took, or conversations he had, demonstrating this support.  Even if the underlying speech is his conversation with Mayerstein about supporting Lourdes' complaint, the Court concludes that is speech related to a personal grievance and dispute as well, as opposed to more generalized speech relating to discriminatory hiring practices.

dispute[] and grievance[] unrelated to the public's interest." Lighton v. Univ. of Utah, 209 F.3d at 1224.  Thus, because the speech is not a matter of public concern, it is not speech protected by the First Amendment.[17]

The third prong of the Pickering analysis is whether there is a genuine issue of material fact that Trujillo's support of Lourdes' lawsuit was a motivating factor in Mayerstein's adverse employment actions.  The Court concludes that there is no genuine issue of material fact of a causal connection between Trujillo's support of Lourdes' EEOC charge and complaint against APS in June 2001 and any adverse employment action.

The earliest date in which Trujillo alleges any negative treatment or hostility is December 2001 -- approximately six months after Lourdes' brought her charge with the EEOC.[18]  The facts, therefore, lack temporal proximity as well as any other evidence indicating that Lourdes' EEOC charge motivated Mayerstein to subject Trujillo to any adverse employment actions.  Moreover, even if Trujillo's support for his wife was not just based on the filing of the EEOC charge, but instead on her ensuing litigation against APS, the facts do not create a genuine issue of material fact that Mayerstein retaliated against Trujillo because of his support for Lourdes.  To the contrary, the record

---

[17] Assuming, however, the Lourdes' allegation of racial- and gender-based discrimination is a matter of public concern, the Court must also balance the interests of Trujillo supporting his wife and APS' interest in regulating his speech.  "A public employer's interest in regulating its employees' speech relates to its interest, 'as an employer, in promoting the efficiency of the public services it performs through its employees.'"  Baca v. Sklar, 398 F.3d at 1220 (quoting Pickering v. Bd. of Educ., 391 U.S. at 568).  Trujillo's support of his wife's allegation that APS engaged in discriminatory hiring practices outweighs APS' interest in regulating Trujillo's speech.  Accordingly, Trujillo's "interest in speaking [would] outweigh [APS'] interest in regulating his speech."  Id.

[18] Mayerstein admits that, in June 2001, he knew that Lourdes' filed a lawsuit against APS, but maintains that he did not know at that time that Lourdes had filed an EEOC charge.  Although it is not clear from the record on which exact date Mayerstein learned of the EEOC filing, the evidence demonstrates that Mayerstein knew of the EEOC charge in September 2001.

indicates that, in late September 2001, Mayerstein and Trujillo cleared the air about Lourdes' complaint against APS, and, at least initially, had a good working relationship.  Mayerstein and Trujillo also attended events outside of work together, such as hockey games with their children. These facts indicate that any adverse actions which occurred were not causally connected to Lourdes' EEOC charge or lawsuit against APS.  Accordingly, there is no genuine issue of material fact whether Mayerstein retaliated against Trujillo on the basis of his support of his wife's EEOC charge.

Even assuming Trujillo established that there was a constitutional violation, Mayerstein is nevertheless entitled to qualified immunity because the law is not clearly established whether the spouse's underlying EEOC charge must be a matter of public concern.  The Tenth Circuit decided Owens v. Rush in 1981.  Although the Supreme Court decided Pickering v. Bd. of Educ. in 1968, the string of subsequent decisions interpreting Pickering v. Bd. of Educ. continue after 1981, including Connick v. Meyers, which the Supreme Court decided in 1983.  In the aftermath of Connick v. Meyers, it is not clear whether Lourdes' EEOC charge must implicate a matter of public concern to warrant First Amendment retaliation protection.

The Tenth Circuit continues to cite Owens v. Rush for the proposition that "protect[ed] activities [include] the assistance of litigation vindicating civil rights."  Hinsdale v. City of Liberal, Kansas, 19 Fed. Appx. 749, 764 (10th Cir. Aug. 28, 2001)(unpublished decision); Copp v. Unified Sch. Dist. No. 501, 882 F.2d 1547, 1550 (10th Cir. 1989).  In McCook v. Springer School District, 44 Fed. Appx. 896 (10th Cir. Aug. 5, 2002)(unpublished decision), however, the Tenth Circuit explained that "filing a lawsuit to vindicate private rights [is] not a matter of public concern[.]"  Id. at 904.  The Tenth Circuit cites Rice v. Ohio Department of Transportation, 887 F.2d 716, 720-21 (6th Cir. 1989), to support this proposition.

In Rice v. Ohio Department of Transportation, the Sixth Circuit addressed whether "the First Amendment . . . prohibits the withholding of promotion in retaliation for the filing of an employment discrimination charge against a government employer." Id. at 720.  Noting that the threshold inquiry is whether the "speech involves a matter of 'public concern,'" the Sixth Circuit held that "[n]ot every job-related grievance of a public employee is a matter of public concern." Id. (quoting Connick v. Meyers, 461 U.S. at 146)(citations omitted).  The Sixth Circuit then discussed the decision of the Honorable Judge Richard A. Posner, Circuit Judge for the United States Circuit Court for the Seventh Circuit, in Yatvin v. Madison Metropolitan School District, 840 F.2d 412 (7th Cir. 1988), in which Judge Posner noted that the legal action at issue was "instituted 'to advance her career, not promote a cause.'" Rice v. Ohio Dep't of Transp., 887 F.2d at 721 (quoting Yatvin v. Madison Metro. Sch. Dist., 840 F.2d at 419).  As the Sixth Circuit explained: "The Yatvin [v. Madison Metropolitan School District] plaintiff could not invoke the protection accorded 'public concern' claims, because she had made no attempt to distinguish her case from the 'run-of-the-mine single-plaintiff discrimination case.'" Rice v. Ohio Dep't of Transp., 887 F.2d at 721 (quoting Yatvin v. Madison Metro. Sch. Dist., 840 F.2d at 420).

Thus, at the time the alleged protected speech occurred -- in 2001 -- the law was not clearly established whether the underlying EEOC charge must be based on a matter of public concern. Accordingly, Mayerstein is entitled to qualified immunity on this basis.

## B.   LOURDES' LETTER.

As with Lourdes' EEOC charge, Lourdes' letter to the school board about Mayerstein's qualifications is not Trujillo's speech.  Because it is not Trujillo's speech and because Trujillo is not alleging he is vindicating his wife's First Amendment rights, he lacks standing to allege a First

Amendment violation on the basis of Lourdes' speech in her letter.  See Martinez v. City of New York, No. 00 Civ. 7914, 2003 WL 2006619, at *4 (S.D.N.Y. Apr. 30, 2003)(rejecting the argument that the plaintiff had standing to allege a First Amendment retaliation based on her mother's speech on the basis of agency principles).  Trujillo, therefore, lacks standing to bring a § 1983 First Amendment retaliation claim on the basis of Lourdes' speech.[19]

Because Trujillo does not have standing to allege a First Amendment retaliation claim based on Lourdes' speech, the Court need not reach the question of whether the speech involved a matter of public concern or whether there is a genuine issue of material fact on adverse action/causal connection.  Accordingly, Mayerstein is entitled to qualified immunity on this basis.

###    C.    STUDENT ABUSE.

In the briefing and at the hearing, Mayerstein and Trujillo discuss Trujillo's report to Smith and Griego in December 2001 that Mayerstein was abusing the students.    At the hearing, the Court assumed, without deciding, that the speech regarding the treatment and possible abuse of students

---

[19] At the hearing on this motion, the Court also assumed, without deciding, that, even if Trujillo had standing, her letter was a matter of public concern.  The Court then held that there was no causal connection between her letter and the March 2002 Record of Counseling.  After Baca v. Sklar, however, the Court would have to consider anew the part of Trujillo's affidavit alleging that Mayerstein's attitude changed, he moved Trujillo's office, he changed Trujillo's chain of command, and he changed Trujillo's schedule.

Although Trujillo's affidavit alleges that these actions occurred, Trujillo did not include this fact in the briefing on this motion -- either as an undisputed material fact to his own motion or in response to Mayerstein's motion.  Instead, Trujillo's counsel mentioned these alleged actions at the hearing on the motion.  See Transcript of Hearing at 93:5-13; 120:13-18.  In any case, the Court did not address whether these actions constituted adverse employment actions, because the Tenth Circuit had not yet decided Baca v. Sklar.  In so far as the Court's oral ruling at the hearing rested on the lack of causal connection between the speech and the adverse employment action, the Court, in light of Baca v. Sklar, no longer rests its decision on this basis.

is a matter of public concern.  The Tenth Circuit, in <u>Rankin v. Independent School District No. I-3, Noble County, Oklahoma</u>, noted that the physical mistreatment of students is of public concern within the area of education, but that the "plaintiff must also present evidence that his speech, by its content, form and context, was itself of general interest rather than of purely personal concern."  876 F.2d at 843.  The Tenth Circuit held that the plaintiff in <u>Rankin v. Independent School District No. I-3, Noble County, Oklahoma</u> had met this burden with evidence that he made a public speech to parents and at board meetings during a time of increased interest in the school district's policy.  <u>See id.</u>  While Mayerstein's alleged conduct does not appear to include physical abuse of any of the students, the conduct encompasses other types of abusive conduct, such as emotional abuse.  The Court finds that Trujillo's speech discussing the student's treatment at the school generally encompasses a matter of public concern.

A relevant part of this analysis, however, is to consider the motivation of the speaker.  <u>See</u> <u>Baca v. Sklar</u>, 398 F.3d at 1219; <u>Lighton v. Univ. of Utah</u>, 209 F.3d at 1224-25.  There is some evidence in the record that Trujillo had a personal interest in the success or failure of Mayerstein in his new position.  Nevertheless, based on the record before the Court, it is not clear that Trujillo's motivation was "purely personal."  To the contrary, during a time when there was much discussion about the VHS ROTC program and the treatment of students within that program, Trujillo voiced his concerns.  The Court, therefore, concludes that his speech regarding student abuses was of public concern.

The next step in the <u>Pickering</u> analysis is for the Court to balance the interests of Trujillo speaking about student abuse and APS' interest in regulating his speech.  "A public employer's interest in regulating its employees' speech relates to its interest, 'as an employer, in promoting the

efficiency of the public services it performs through its employees.'" Baca v. Sklar, 398 F.3d at 1220 (quoting Pickering v. Bd. of Educ., 391 U.S. at 568). Trujillo's speech about possible abusive treatment of students outweighs APS' interest in regulating Trujillo's speech. The Court therefore finds that Trujillo's "interest in speaking outweighs [APS'] interest in regulating his speech." Id.

The Court must now determine -- on the third Pickering step, whether the speech was a motivating factor in the adverse employment action -- whether Trujillo suffered an adverse employment action because of his protected speech. There must be a causal connection between the adverse action and the protected speech.

Trujillo must first present evidence that he suffered an adverse employment action. In regard to Mayerstein's personal memoranda documenting Trujillo's performance, the Court concludes that these did not constitute an adverse employment action. Trujillo did not offer evidence demonstrating that these memoranda were distributed to others and, if so, to whom. To the contrary, the evidence shows that the memoranda were for Mayerstein's personal file. The Court cannot conclude, therefore, that such memoranda constitute adverse employment actions because there is no evidence that Mayerstein distributed these memoranda to other employees or supervisors, including Trujillo.

Moreover, insofar as Trujillo alleges the negative comments in Mayerstein's memoranda constituted adverse employment actions, this claim must fail because the Tenth Circuit has recently acknowledged that the law in this Circuit, and in other Circuits, is unsettled whether derogatory comments are sufficient to establish an adverse employment action. See Hardeman v. City of Albuquerque, 377 F.3d at 1118-19. Even if the Court concluded that the negative comments in these memoranda constituted adverse actions, and Trujillo satisfied all of the other prerequisites for a constitutional violation for First Amendment retaliation, Mayerstein would nevertheless be entitled

to qualified immunity under the second prong of the analysis because the law is not clearly established in this area.

There is evidence in the record that Mayerstein moved Trujillo's office, changed his chain of command with the cadets, and altered his work schedule.  See Trujillo Aff., October 26, 2003, ¶¶ 21-22, at 7-8.  Trujillo did not mention this fact in his briefing, but he did refer to it during oral argument on the motions.  See Transcript of Hearing at 93:5-13; 120:13-18.  The Tenth Circuit, in Baca v. Sklar, clarified that an action may be sufficiently adverse for First Amendment retaliation purposes that would otherwise not be in the Title VII context.  See 398 F.3d at 1220-21.  The Court, therefore, finds that these actions constitute adverse employment actions in the First Amendment retaliation context.

The Court also concludes that the Record of Counseling, issued by Mayerstein in March 2002, constitutes an adverse employment action.  Trujillo also received a Letter of Understanding and was placed on administrative leave, but admits that  these incidents do "not relate to actions taken by Mayerstein."  Plaintiff's Reply at 4.  Trujillo, however, provides no authority or support for the position that Mayerstein, even though he did not participate in these actions against Trujillo, can be held liable for such actions.  Thus, the Court cannot find that Mayerstein subjected Trujillo to adverse actions based on the Letter of Understanding and being placed on administrative leave.

The Court concludes that there is no evidence in the record to create a genuine issue of material fact that Mayerstein was aware of Trujillo's report to Griego and Smith on the student abuses.   When asked about the evidence supporting Mayerstein's knowledge of Trujillo's conversation with Griego and Smith, Trujillo's counsel at the time did not highlight any evidence to the Court indicating that Mayerstein knew of Trujillo's report until April 2002.  See Transcript of

Hearing 91:1 - 92:4.  In his sworn affidavit, Trujillo alleges that, in an April 7, 2002, document, he referenced his reporting of the student abuse to school officials as a basis for Mayerstein's allegedly retaliatory conduct.[20]  Trujillo does not, however, offer evidence that Mayerstein knew of these reports before or during the time in which he allegedly subjected Trujillo to adverse employment actions.  See Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993)(holding, in the Title VII context, that the "plaintiff must show that the individual who took adverse action against him know of the employee's [plaintiff's] protected activity"); Sheker v. Grimes, No. 94-6312, 1995 WL 330749, at *3 (10th Cir. June 5, 1995)(unpublished decision)(" Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech.")(quoting  O'Connor v. Chi. Transit Auth., 985 F.2d 1362, 1370 (7th Cir. 1993), overruled in part on other grounds by Spiegla v. Hull, 371 F.3d 928, 941-42 (7th Cir. 2004)).

_____

[20] Trujillo did not mention this fact in his motion or in response to Mayerstein's motion. Instead, Trujillo's counsel cited to this portion of the record for the first time at the oral hearing on these motions.  See Transcript of Hearing at 91:23- 92:4.

The only evidence Trujillo offers of the April 7, 2002, document is his own sworn affidavit in which he maintains that he submitted the memorandum to Griego in rebuttal of Mayerstein's record of counseling.  According to the affidavit, Trujillo's memorandum asserted that Mayerstein fabricated the allegations against him because he had reported Mayerstein's abuses and supported his wife's charges.  "The testimony and averments of a party, however, are legally competent to oppose summary judgment, notwithstanding their inherently self-serving nature, provided they are 'based on personal knowledge and set forth facts that would be admissible in evidence.'"  Kirk v. City of Tulsa, Oklahoma, 72 Fed. Appx. 747, 751 (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)). Thus, because the affidavit is based on personal knowledge, the Court must consider Trujillo's representations about the April 7, 2002, memorandum.  If, however, Trujillo offers the statement contained in the memorandum for the truth of the matter asserted -- that Mayerstein retaliated against Trujillo because he reported the student abuses -- it would constitute inadmissible hearsay.  Trujillo, however, offers the statement to demonstrate Mayerstein's knowledge of Trujillo's reporting the abuses to Griego.  Accordingly, Trujillo's statement about what the memorandum contained, if offered to show Mayerstein's state of mind, is admissible pursuant to rule 803(3) of the Federal Rules of Evidence -- the state of mind exception to the hearsay rule.

By not offering any evidence to demonstrate Mayerstein knew of Trujillo's conversation with Griego and Smith, Trujillo has not established a genuine issue of material fact whether Mayerstein retaliated against him on the basis of this speech.  Accordingly, Mayerstein is entitled to qualified immunity.

## II.    MAYERSTEIN IS ENTITLED TO SUMMARY JUDGMENT ON TRUJILLO'S FAMILIAL ASSOCIATION CLAIM.

To establish a genuine issue of material fact that Mayerstein violated Trujillo's right to familial or martial association, Trujillo must offer sufficient evidence that Mayerstein acted with the specific intent of interfering or disrupting Trujillo's marital relationship with Lourdes.  Although the Complaint mentions Mayerstein's accusation that Trujillo had sexual relations with a cadet's mother in the armory, the Complaint does not mention or allege that such accusations had an effect on -- or was done with the specific intent to harm -- his martial relationship.  See Complaint ¶¶ 37-40, at 14-15.  The Complaint couches the recitation of the armory incident in terms of defamation and the impact such "scandalous accusations" had on Trujillo's career.  Id. ¶ 39, at 14.  Absent from the Complaint, however, is the impact such accusations had on Trujillo's marriage or the allegation that Mayerstein made the accusations with the intent of damaging Trujillo's marriage.

Moreover, under Count IV, Deprivation of Civil Rights Under Color of State Law, Trujillo makes no reference to the deprivation of his right to marital or familial relations; instead, the Complaint states: "The Plaintiff was deprived of other Constitutionally-protected rights."  Id. ¶ 89, at 28.  Even construing the pleadings liberally because Trujillo now proceeds *pro se*, and finding that the Complaint sufficiently alleges a claim for the right to marital association, the Court cannot conclude that the Complaint states that Mayerstein's accusations were done with the specific intent

to harm Trujillo's marital relationship.  <u>See</u> <u>Bryson v. City of Edmond</u>, 905 F.2d at 1394.  In addition

to lacking an allegation in the complaint that Mayerstein acted with the requisite specific intent, there

is also no evidence before the Court in the record sufficient to establish a genuine issue of material

fact that Mayerstein acted with such a specific intent.

  Because Trujillo does not allege or offer evidence that Mayerstein acted with the specific

intent to interfere with Trujillo's marital relations with his wife, Mayerstein is entitled to qualified

immunity on this claim.

  In sum, there is no genuine issue of material fact whether Mayerstein violated Trujillo's

constitutional rights by unlawfully retaliating against him in violation of the First Amendment, or by

unlawfully interfering with his right to marital relations.  Because there is no genuine issue of material

fact that Mayerstein violated Trujillo's constitutional rights, Mayerstein is entitled to qualified

immunity.

  **IT IS ORDERED** that Defendant Mark Mayerstein's Motion for Summary Judgment is

granted, and Plaintiff Transito Trujillo's Motion for Summary Judgment as to Plaintiff's § 1983 Claim

Against Defendant Mayerstein is denied, and the Plaintiff's claims against Mayerstein are

**DISMISSED WITH PREJUDICE**.


                _____

          UNITED STATES DISTRICT JUDGE

Transito Trujillo
Albuquerque, New Mexico

     *Pro se Plaintiff*

Max J. Madrid
Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk
Albuquerque, New Mexico

     *Attorneys for Defendants Board of Education,*
     *Albuquerque Public Schools; Joseph Vigil;*
     *Susie Peck; Anthony Griego; Bruce Smith;*
     *and Ronald Williams*

Richard L. Alvidrez
Sean Olivas
Keleher & McLeod
Albuquerque, New Mexico

     *Attorneys for Defendant Mark Mayerstein*