# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TRANSITO TRUJILLO,

     Plaintiff,

vs.                                                                                    No. CIV 02-1146 JB/LFG

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,
JOSEPH VIGIL and SUSIE PECK, Albuquerque
Public Schools Superintendents individually and
in their official capacities; ANTHONY GRIEGO,
Principal, Valley High School, individually and in
his official capacity; BRUCE SMITH, Valley High
School Assistant Principal, individually and in his
official capacity; RONALD WILLIAMS, Director
of Certified Staffing, Albuquerque Public Schools,
individually and in his official capacity; and MARK
MAYERSTEIN, Valley High School employee,
individually and in his official capacity,

     Defendants.

-- and --

TRANSITO TRUJILLO,

     Plaintiff,

vs.                                                                                    No. CIV 03-1185 JB/LFG

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS;
MARK MAYERSTEIN, Senior ROTC
Instructor, and ANTHONY GRIEGO,
Valley High School Principal, in their
official and Individual capacities,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on (i) the Defendants' Motion in Limine to Exclude Irrelevant and Prejudicial Evidence of Mark Mayerstein's Alleged Mistreatment of Students, filed June 18, 2007 (Doc. 363), and (ii) the Defendant's Motion in Limine to Exclude Plaintiff's Witnesses, filed June 18, 2007 (Doc. 364). The primary issues are: (i) whether, under Title VII, the fact that Mark Mayerstein abused or mistreated Air Force Junior Reserve Officer Training Corps students at Valley High School ("VHS") is relevant to the issue whether APS took action retaliating against Plaintiff Transito Trujillo; and (ii) whether the Court should allow Trujillo to elicit testimony tending to show that Mayerstein, Trujillo's supervisor, abused those students and that Trujillo complained to persons besides Albuquerque Public Schools ("APS") and its agents about the alleged abuse. Because the Court concludes that such testimony has some relevance to Trujillo's claims brought for retaliation under Title VII and because the Court cannot say that unfair prejudice to the Defendants outweighs any probative value this evidence may potentially have, or will unfairly distract from the central issues in the case and needlessly prolong the trial, the Court will deny the motion, without prejudice to APS raising the issue again if the testimony becomes cumulative.

## FACTUAL BACKGROUND

The Court has often set out the factual background of Trujillo's suit, viewing the evidence in a light most favorable to him where the facts are disputed.

> The Court has set forth many of the relevant undisputed background facts in several written opinions. See, e.g., Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d 997, 983-84 (D.N.M. 2004)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d 994, 1000-05 (D.N.M. 2004)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d 1020, 1025-29 (D.N.M. 2004)(Browning, J.). The Court will set forth additional undisputed facts as presented in the parties' current motions for summary

judgment.

> [T]he Albuquerque Public Schools ("APS") hired Trujillo at Valley High School ("VHS") as Aerospace Science Instructor ("ASI') in the Air Force Junior ROTC ("AFJROTC") program. Trujillo held the position of ASI for eleven years.
> . . . .
> Trujillo's wife, Major Lourdes Trujillo, was also a qualified AFJROTC instructor.  When a position for Senior ASI became available in the VHS AFJROTC program, Lourdes Trujillo applied for the position. APS hired Defendant Mark Mayerstein,  rather than Lourdes Trujillo, to fill the position.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs, 377 F. Supp. 2d at 982 (citations to record omitted).

The specific Senior ASI ("SASI") position at VHS included a duty to teach an honors "Private Pilot's Ground School" class that required the instructor to be "both Private Pilot Ground School and FAA Instructor certified." Plaintiff's Response to Defendants' Motion for Summary Judgment, filed October 27, 2005 ("Plaintiff's Response")(Doc. 56), Exhibit 9, ¶ 9.  It is undisputed that Lourdes did not have these qualifications. Nevertheless,

> Lourdes . . . filed an Equal Employment Opportunity Commission ("EEOC") complaint on June 1, 2001, alleging discrimination based on national origin and sex. Trujillo contends that Lourdes' EEOC charge was "generally known"-- and known to the individual defendants to this lawsuit -- in December 2001. Trujillo alleges that he openly supported Lourdes in the EEOC process and as she prepared to litigate the issue.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 1026 (citations to record omitted).

As it turned out, although he represented to APS that he would be FAA certified to teach the honors class before he began teaching, Mayerstein did not complete his FAA certification before he took over the honors class in October 2001. Trujillo discovered this fact in November 2001.

> According to Trujillo, he asked Mayerstein if he was FAA certified, Mayerstein replied that he was not. He then "reported Mayerstein to [Anthony] Griego," VHS' principal, because "Mayerstein did not comply with Air Force mandated requirements." On December 10, 2001, Lourdes wrote a letter to the Board of Education asserting that Mayerstein was teaching the ROTC Private Pilot Ground School course without the proper certification.

Id. at 1027 (citations to record and footnotes omitted). "Beginning in November 2001, Mayerstein reported to the VHS administration that Trujillo was not working his scheduled hours and rarely came to class prepared to teach. . . . Trujillo maintains that Mayerstein's allegations about his work performance are untrue." Id. at 1028. The tension and disagreement between Mayerstein and Trujillo became extreme.

On March 20, 2002, Mayerstein, who, under the AFJROTC regulations, was Trujillo's supervisor, formally counseled Trujillo about not being at work the requisite number of hours, not using a "planned and cohesive curriculum," not properly ordering uniforms and supplies, and not participating in progress reporting, and he informed the national AFJROTC headquarters of the problems. See Defendants' Response to Motion for Summary Judgment, filed November 1, 2005 ("Defendants' Response")(Doc. 57), Exhibit A; Plaintiff's Reply to Defendants' Response to Motion for Summary Judgment ("Plaintiff's Reply"), filed November 16, 2005 (Doc. 61), Exhibit 3. On April 3, Mayerstein gave Trujillo a "Minimum Tasking" document during another formal counseling session, contending that Trujillo had refused "to accept" the March 20 counseling. Defendants' Response, Exhibit B. The tasking document was "coordinated with, and approved by, HQ AFROTC/JRI and Mr. Griego." Id. The tasking document instructed Trujillo to "cease and desist immediately in your practice of involving students in any disputes between us." Id. at 3. Trujillo refused to sign a "Record of Counseling," stopped the proceedings, and asked for a lawyer. See id. at 1. That same day, Trujillo filed a charge of discrimination/retaliation with the EEOC, asserting that Mayerstein, Griego, and APS were retaliating against him because of his support of Lourdes' EEOC complaint. See Plaintiff's Motion for Summary Judgment, filed October 19, 2005, Exhibit 7.

On April 4, Trujillo sent Griego a memorandum asserting that Mayerstein, "in a vindictive, immature nature, is withholding information that I need to do my job." Defendants' Motion for Summary Judgment, filed October 13, 2005 (Doc. 50), Exhibit C at 1. On April 7, Trujillo prepared a lengthy rebuttal to his April 3 counseling, alleging that Mayerstein's statements were "complete fabrications." Id. at 2. Trujillo also asserted that the military "has no jurisdiction over" him or Mayerstein and had no say in Griego's decision to hire or fire him, as long as Trujillo was qualified for a ROTC position. Id. Trujillo complained that Griego had "no idea what is going on in [his] ROTC unit" and asked him to "[t]alk to the students." Id. Trujillo stated that, to allow Mayerstein to remain in his position as SASI was to "condone his abusive behavior," and warned that he would "seek every legal opportunity" at his disposal "to have the current arrangement resolved." Id. at 7. That same weekend, VHS parents of ROTC students staged a demonstration, which the media covered, to complain about Mayerstein. Mayerstein asserted that it was "orchestrated by. . . Trujillo's supporters." Plaintiff's Motion for Summary Judgment, Exhibit 8.

While Trujillo asserts that he did not organize the demonstrations, apparently parents demonstrated in front of the school -- and on the evening

news -- against what they perceived was happening in the AFJROTC program and specifically against Mayerstein's abusive behavior to the students. Students and parents began to take sides between Mayerstein and Trujillo. All parties agree that a hostile educational environment existed at VHS in the spring of 2002.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 992.

On April 8, 2002, many parents also came to the APS Service Center to complain about Mayerstein. See Plaintiff's Motion for Summary Judgment, Exhibit 18. As a result, Griego responded that he had "contacted the military who will conduct their own investigation." Id. On April 11, another parent called the APS Service Center to complain that she experienced a "confrontation" with Trujillo. Id., Exhibit 20. She said that she and 12 other concerned parents did not "care what action Mr. Griego takes. They just don't want the ROTC program to end." Id.

VHS's assistant principal Bruce Smith sent Trujillo a "Letter of Understanding" on April 11. Defendants' Response, Exhibit E. The letter stated that Trujillo's refusal to continue the April 3 counseling proceeding was "insubordinate" because he should know he was bound by the rules and procedures set forth by his AFJROTC military command as well as by APS' rules. Id. Smith noted that he had tried to reach Trujillo several times and found him to be off campus, and that Trujillo should not be off campus during school hours without signing out. See id. He noted that Trujillo had been told at the April 3 meeting not to involve others in his disagreements with Mayerstein but that Trujillo was "soliciting other staff to be involved." Id. He stated that the "administration will interview and investigate as they see fit," and that Trujillo should "[s]top this practice at once." Id. Smith warned Trujillo that "[t]he problems in the ROTC program have spread to a point where the total program is in jeopardy. The students and parents are divided, and support for the program is failing. Both parties are to stop their actions. This has been conveyed to you at a meeting and now in writing." Id.

Smith apparently did not copy the memorandum of understanding to the national AFJROTC headquarters, however. See id. Griego contacted APS' Office of Equal Opportunity Services ("OEOS"), requesting an investigation and stating that Mayerstein's and Trujillo's conduct "was adversely impacting the students." Plaintiff's Motion for Summary Judgment, Exhibit 11 at 1. On April 15, 2002, Mayerstein gave Trujillo an unsatisfactory rating on his annual ROTC evaluation. See id., Exhibit 9. According to AFJROTC regulations, school principals are considered the program directors of the ROTC programs at the school level, and his/her "evaluation or indorsement can initiate action which could result in AFJROTC instructor decertification action." Id., Exhibit 13, ¶ 3.2. Bases for decertification include: being overfat; engaging in an incident of willful misconduct; fraudulently certifying information in an instructor application; engaging in conduct "that does not meet the standards expected of an Air Force officer;" engaging in "conduct causing

discredit or embarrassment to the Air Force or the AFJROTC program;" or receiving an unappealed-from overall evaluation of "unsatisfactory" indorsed by the principal. Id. ¶¶ 2.2.6-2.2.6.4.

Instead of concurring in Mayerstein's unsatisfactory rating of Trujillo, however, Griego voided the comments that Mayerstein had attributed to him and did not indorse the evaluation. See Plaintiff's Response, Exhibit 13. On April 17, Griego prepared a satisfactory teacher's evaluation for Trujillo, see id., Exhibit 16; recommended his re-employment, see id.; and attached a memorandum to Mayerstein's ROTC evaluation of Trujillo stating that Trujillo and Mayerstein had a "personality conflict . . . that has led to the rating,"  Defendants' Response, Exhibit J.

On April 18, 2002, the APS Service Center received yet another parent's complaint that Mayerstein was "in a 'pissing' contest with Chief Trujillo."  Plaintiff's Motion for Summary Judgment, Exhibit 22.  Griego stated he would meet with parents to address their concerns. See id.  On April 19, Smith gave Mayerstein a formal letter of reprimand for dealing with parents and students in a "negative and demeaning manner."  Defendants' Response, Exhibit D.  He noted that the ROTC program was "highly divided . . . [which was] easily documented by the volume and content of the calls being received from parents."  Id.  Smith sent a copy of the letter of reprimand to JoAlice Talley, the national certification officer of the AFJROTC. See id.

On April 22, 2002, Barbara Lynn, the Director of OEOS, recommended that both Mayerstein and Trujillo be placed on paid administrative leave for the remainder of the school year pending an investigation into whether the conduct between them had "lead to a hostile educational environment for the students."  Plaintiff's Reply, Exhibit 7.

Griego gave Trujillo a copy of Mayerstein's ROTC evaluation on April 24, 2002, and Trujillo requested that it be "voided" as "false and vindictive."  Plaintiff's Response, Exhibit 13 at 2.  On April 29, 2002, APS notified Trujillo that he had been re-employed for the following year, see Plaintiff's Reply, Exhibit 8, but that same day Ronald Williams, APS' Director of Certified Staffing, notified Trujillo and Mayerstein that both of them had been placed on paid administrative leave, "pending an investigation of allegations that you have created a hostile educational environment at [VHS],"  Defendants' Motion for Summary Judgment, Exhibit B-1, B-2.  On May 24, 2002, the APS OEOS office conducted an "investigative meeting" with Trujillo, accompanied by his attorney.  Plaintiff's Response, Exhibit 27.

Apparently in response to Trujillo's insistence that Griego needed to talk directly to the ROTC cadets to find out what was going on in the ROTC program, Lynn also interviewed VHS ROTC Cadet Officers, and prepared a written report on June 11.  In her OEOS report, Lynn listed the following concerns and opinions she

gathered from the ROTC cadets: there was "tension and inappropriate conduct" between Mayerstein and Trujillo that impacted the classroom and "at times created a hostile environment;" Mayerstein used inappropriate language and had temper tantrums; Trujillo was not available to the students but did provide instruction related to the program; "both instructors had hindered their senior year;" "both instructors were not role models and acted as children;" and both instructors should be removed. Plaintiff's Motion for Summary Judgment, Exhibit 11 at 2. Lynn found that "the students were used as pawns between the AFJROTC instructors and parents," id., and that both men "were soliciting support from the students to assist in their own agenda for their positions with the District." Id. at 3.

Lynn also listed her own concerns that Trujillo: refused to take direction from Mayerstein and did not follow AFJROTC rules; incited parents and contacted them to support his position; and limited his time at VHS. See id. She listed concerns about Mayerstein as well. They included: his use of profanity with students; demeaning, threatening, and belittling students in front of their peers; retaliating against students who exercised their right to seek assistance from the VHS administration; "informing the [VHS] administration and HQ AFOATS/JA and the Instructor Management Branch of Mr. Trujillo's poor job performance and then recanting his allegations of his competence;" and disregarding the AFJROTC curriculum and not ensuring it was accessible to all students. Id. She recommended that both instructors be terminated, but suggested that APS could consider placing Trujillo under "intensive evaluation" with warnings that inappropriate conduct could result in discipline and termination. Id. at 4.

Trujillo filed a second EEOC complaint against APS, Griego, Mayerstein, and Susie Peck (APS' assistant superintendent) on June 28, 2002. See Defendants' Motion for Summary Judgment, Exhibit A. He alleged he had heard rumors that he might be terminated; that Mayerstein had rearranged his office; and that someone had been hired to replace him. See id. He complained that Mayerstein was being allowed on the VHS campus, while he had been banned from campus. See id. He asserted that the actions were in reprisal for his EEOC complaint and for supporting his wife. See id.

On July 12, 2002, APS' attorney notified Trujillo's attorney that both Mayerstein and Trujillo would be returned to their employment under "intensive evaluation." Plaintiff's Response, Exhibit 14. Upon hearing that Trujillo would be re-employed, Mayerstein wrote a letter to APS' acting superintendent and copied it to the AFJROTC parent's council and to the national AFJROTC headquarters. He asserted that Trujillo's continued employment would "irreparably damage the credibility of the AFJROTC program and the regulations." Defendants' Motion for Summary Judgment, Exhibit C-12. He accused Trujillo of "blatantly" violating the values of "responsibility, duty, leadership, and morality" the previous school year by: working an average of only 15.67 hours/week for three quarters of the year; not teaching a "planned, cogent curriculum;" not fulfilling his duties involving teaching,

drill teams, uniforms, and accounts; disregarding ROTC and Faculty rules; undermining Mayerstein's authority; and making "dates for lunch and after school hours with a woman to whom he was not married and with whom, many firmly believe, he had a past sexual history." Id.  According to Mayerstein, continuing to employ Trujillo would send a message to ROTC cadets, their parents, taxpayers, and APS employees that it was okay not to come to school; that there were no consequences to not following the rules; and that "immorality, actual or perceived, is not something about which to be concerned." Id.  Mayerstein warned that employing Trujillo would "drastically affect AFJROTC enrollment" and that Trujillo would "be the cause of extreme tension in the unit." Id.

Nevertheless, on August 2, Peck notified Trujillo that she had decided Trujillo would return to teaching at VHS; that a military decertification process should be reviewed during the next school year; and that she had requested Griego to "follow procedures to address areas of concern via the evaluation process." Plaintiff's Motion for Summary Judgment, Exhibit 12.  Accordingly, on August 8, 2002, Griego gave Trujillo another Memorandum of Understanding setting out how Trujillo was to conduct himself and what steps Griego would take to evaluate him. See Defendants' Response, Exhibit I.  Mayerstein was similarly re-employed.

In the meantime, Michael Doyle, the national Deputy Director of the AFJROTC program who had been aware of the imbroglio since March, sent both ROTC instructors a letter on August 6, 2002, instructing them that neither should send correspondence to ROTC parents without his office's and Griego's prior approval and that there should be no discussion with parents about their personal conflicts and complaints because they had "polarized cadets and parents and negatively impacted the image and mission of the AFJROTC program." Defendants' Response, Exhibit G.  Doyle warned Mayerstein and Trujillo that a "failure or refusal to follow these directives will result in immediate consideration for decertification." Id.

On August 15, 2002, Mayerstein wrote a memorandum stating that Trujillo had not reported to duty as Griego had instructed and that Trujillo had given the headquarters AFJROTC e-mail address to an organization called Libertad, which sent inflammatory e-mails to headquarters. Plaintiff's Response, Exhibit 20.  He asserted that Trujillo was responsible for new news reports that accused Mayerstein of wrongdoing, and that Trujillo was complaining to cadets about changes Mayerstein had made. See id.

Doyle went to VHS to meet with administrators, Mayerstein, and Trujillo on August 20, 2002. At that time, Williams gave Doyle a copy of the June 11 OEOS report that Lynn had prepared.  See Plaintiff's Response, Exhibit 3a.  Trujillo informed Doyle that he "had filed EEOC charges against [Doyle] for implying on a letter of August 6, 2002, that [Trujillo] caused division among parents and ROTC students and was responsible for the disruption of the program, which is a lie." Id., Exhibit 19 at 4.  A group of ROTC parents, again accompanied by television reporters

and the press, asked to present complaints about Mayerstein to Doyle, but he declined. See Plaintiff's Reply, Exhibit 6.  In his August 21, 2002, report to the national AFJROTC Director, Doyle reported being "mobbed and surrounded" by the parents, and that they "pushed, pulled, kicked, and spat at" him.  Id.

On August 23, 2002, the national AFJROTC Director notified Mayerstein and Trujillo that both of them had been decertified as ROTC instructors.  See Defendants' Motion for Summary Judgment, Exhibits G-1 & G-2.  Citing applicable AFJROTC regulations, the Director stated that their

> conduct has not met the standards expected of [] Air Force . . . Officer[s] and has caused discredit and embarrassment to the Air Force and AFJROTC program.  Your actions have directly contributed to a hostile work environment and have unfavorably represented the Air Force and AFJROTC to [VHS].

Id.  APS put Mayerstein and Trujillo on paid administrative leave on September 3, 2002, after receiving notification of their decertification, reminding them that they could not teach without a valid certificate to teach from the Air Force.  See id., Exhibit A-2 at 5.  APS gave them formal notice of termination on October 16, with an opportunity to appeal.  See id., Exhibits J-1, J-2.  The reason for the terminations was that their "certification to instruct an Air Force Junior ROTC program has been withdrawn."  Id.

Trujillo filed a third EEOC complaint against APS and its Superintendents on October 2, 2002, alleging that APS employees "engaged in a campaign to remove me based on false allegations and investigations" in reprisal for his Hispanic heritage, his EEOC complaints, his support of his wife, and for supporting VHS students who were abused by Mayerstein.  Defendants' Motion for Summary Judgment, Exhibit A-2. Trujillo alleged that Mayerstein, Griego, Smith, Williams, Peck, and Superintendent "Joe Vigil, together with Air Force actors, engaged in a campaign to remove me based on false allegations and investigations."  Id.

Memorandum Opinion and Order at 2-12, filed November 21, 2006 (Doc. 91).

## PROCEDURAL BACKGROUND

Trujillo has listed eleven witnesses that he intends to call to testify about Mayerstein's alleged abuse of students:

Lorraine Marquez (VHS principal Griego and vice-principal Smith did not respond to her complaints about Mayerstein's abuse of her son; Trujillo was professional and courteous when

listening to her about her complaints)

Estrella Serna (Griego did not respond to her complaints of racial discrimination by Mayerstein)

Dalia Griego (Mayerstein abused her daughter and engaged in reprisal against her for publicly protesting against him)

Cynthia Ruiz (Mayerstein abused her son and engaged in reprisal against her for publicly protesting against him)

Juan Josa Pena (Trujillo reported to him Mayerstein's racial discrimination and Pena wrote to Vigil and Griego, but got no response)

Maximo Hernandez (acted as Trujillo's "administrative" representative, reported Trujillo's "protected speech" to the Air Force, NM Department of Education, and APS)

Ernest Romero (complained to Griego about Mayerstein's abuse of nephew but complaints went unanswered)

R. Vasquez (complained to Griego about Mayerstein's abuse of her daughter but complaints went unanswered; Trujillo listened to her complaints professionally and courteously)

Justine Romero (Mayerstein gave preferential treatment to students who supported him and downgraded those who did not)

Maria Serna ((Mayerstein gave preferential treatment to students who supported him and downgraded those who did not)

Danielle Griego (Mayerstein abused Hispanic students).

## APPLICABLE LAW

1. **Protected Activity**.

Title VII of the Civil Rights Act of 1964 prohibits an employer from taking discriminatory

employment action against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII also contains an anti-retaliation provision that "forbids an employer from 'discriminating against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."  Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2408 (2006)(quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, a plaintiff must establish that: (i) the plaintiff was engaged in an activity that Title VII protects; (ii) the plaintiff was subsequently subjected to an adverse employment action; and (iii) a causal relationship exists between the protected activity and the adverse employment action.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1234 (10th Cir. 2000).

Opposing actions that are not employment practices is not protected under Title VII.  See Artis v. Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1183 (8th Cir. 1998)("[O]pposing an employer's actions outside the ambit of an employment practice is unprotected by Title VII."); Evans v. Kansas City, Mo. Sch. Dist., 65 F.3d 98, 101 (8th Cir.1995)(stating that "Title VII is not a 'bad acts' statute" and finding no Title VII violation where employee complained of school's failed responsibility to its students, because that is not a complaint based on an employment practice)(internal quotation marks omitted); Jamil v. Sec'y of Defense, 910 F.2d 1203, 1207 (4th Cir.1990)(noting that Title VII does not protect opposition to employer action which does not constitute an employment practice).

### 2.   Pretext.

The Tenth Circuit has emphasized that, "in evaluating pretext, the relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." Stover v. Martinez, 382

F.3d 1064, 1076 (10th Cir. 2004)(internal citations and quotation marks omitted).  See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998)("[Plaintiff] has not shown that at the time of his termination there was any dispute or a genuine issue concerning the sincerity of defendants' proffered reason for his termination.").  In Plotke v. White, 405 F.3d 1092 (10th Cir. 2005), the Tenth Circuit held that pretext is sufficiently shown for summary judgment purposes whenever a plaintiff demonstrates that the "true facts" associated with a termination differ from what the employer honestly believed to be the case.  See id. at 1103-08; Morgan v. Hilti, Inc., 108 F.3d 1319, 1324 (10th Cir. 1997)(granting summary judgment because there was no showing of pretext where the plaintiff did not demonstrate that there were any implausibilities, inconsistencies, or contradictions in the defendant-employer's course of conduct).

### 3.   Fed. R. Evid. 401, 402, and 403.

APS brought its motions under rules 402 and 403 of the Federal Rules of Evidence.  The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Rule 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided . . . by these rules . . . .  Evidence which is not relevant is not admissible."  Fed. R. Evid. 402.

Rule 403 authorizes a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  In evaluating whether evidence should be excluded on grounds of unfair prejudice, courts should consider the probable effectiveness of a limiting instruction and the availability of less prejudicial, alternative means of proof.  See Old Chief v. United States, 519 U.S.

172, 184-85 (1997)("[W]hen Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives."); Fed. R. Evid. 403 advisory committee's note.  The United States Court of Appeals for the Tenth Circuit has cautioned that "[e]xcluding otherwise admissible evidence under Rule 403 'is an extraordinary remedy that should be used sparingly.'" Mendelsohn v. Sprint/United Mgmt. Co., 466 F.3d 1223, 1231 (10th Cir. 2006)(quoting United States v. Roberts, 88 F.3d 872, 880 (10th Cir. 1996)).

## ANALYSIS

APS is correct that evidence of Mayerstein's alleged abuse of students is not relevant to establishing any of the elements of Trujillo's prima facie case of Title VII retaliation.  APS is also correct that Trujillo's complaints about Mayerstein's alleged abuse of students are not protected activity.   APS has, however, made Mayerstein's conduct relevant by advancing some of its legitimate, non-discriminatory reasons for terminating Trujillo's employment.  Whether Mayerstein actually did the things about which Trujillo's witnesses intend to testify may tend to prove or disprove that Mayerstein or APS retaliated against Trujillo for supporting his wife's Equal Employment Opportunity Commission ("EEOC") charge or for filing his own EEOC charges.  The Court cannot say that the main purpose for introducing such evidence appears to be convincing the jury that Mayerstein is a "bad guy," which could inflame the jury and thereby unfairly prejudice APS.

Reading Trujillo's responses to the motions in limine liberally, it appears that he argues that Mayerstein's behavior is relevant because APS accused Trujillo of creating an adverse learning environment for students, and Trujillo insists that Mayerstein was the only one who created the hostile environment.  See Pro Se Plaintiff's Consolidated Response to Defendants Motions in Limine,

-13-

Doc. Nos. 357, 359, 361, 363, and 364, filed June 19, 2007 (Doc. 367).   The record indicates that APS investigated whether Trujillo and Mayerstein were creating a hostile learning environment and APS' employees concluded that they were, and that they should both be terminated.   Whether Mayerstein was guilty of abusing students is relevant to why APS reached the conclusion that Trujillo was involved in creating an adverse environment.   Therefore, to the extent that Trujillo's witnesses intend to testify about Mayerstein's alleged abuse the Court cannot say that the testimony is irrelevant, inadmissible, and unfairly prejudicial.

APS takes the position that it took adverse employment action against Trujillo, in part, because he created an adverse learning environment.   Trujillo contends that APS began to take certain steps against him because he supported his wife's discrimination complaint.   The jury will have to determine why APS did what it did.   The determination will require credibility determinations.   If Mayerstein was not abusing students, that fact may increase the likelihood that APS took its action because Trujillo was creating a hostile learning environment.   If Mayerstein was abusing students, that fact may increase the likelihood that APS took its action because of a reason independent of the hostile learning environment.   Whether Mayerstein actually did the things about which witnesses intend to testify may tend to prove that Mayerstein or APS retaliated against Trujillo for supporting his wife's EEOC charge or for filing his own EEOC charge, or for one of APS' stated reasons.   To a certain extent, the Court will need to allow Trujillo and APS to tell their stories as to what was happening at VHS so that the jury can determine why APS took the adverse employment actions it did.   To exclude Trujillo's evidence would be to allow APS to state its legitimate, non-discriminatory reasons, but not to allow Trujillo to prove those reasons were false or pretextual.

It is true that proving that Mayerstein did something that APS believed he did and for which, in part, APS agents recommended that he be decertified by the Air Force, does not directly prove,

and only weakly supports, that Trujillo did not do the things that APS believed Trujillo did, and for which it also recommended his decertification. But APS' argument assumes that the Court knows precisely how the evidence will play out at trial, and that APS and Mayerstein will be prepared to admit that Mayerstein was abusing students. APS may make that concession, because Lynn's report regarding Trujillo, which an APS agent gave to Dole, stated there was "tension and inappropriate conduct" between Mayerstein and Trujillo that impacted the classroom and "at times created a hostile environment"; Trujillo was not available to the students and limited his time at VHS; "both instructors had hindered their senior year"; "both instructors were not role models and acted as children"; "the students were used as pawns between the AFJROTC instructors and parents;" both men "were soliciting support from the students to assist in their own agenda for their positions with the District"; Trujillo refused to take direction from Mayerstein and did not follow AFJROTC rules; and Trujillo contacted parents to elicit support for his position. There is no guarantee, however, at pre-trial that Mayerstein will admit to all of those faults, and Trujillo is also unlikely to agree to these charges.

APS suggests that determining whether Mayerstein did the things of which he was accused was not Lynn's basis for determining that Trujillo did the behaviors that also caused the hostile learning environment, and that, instead, both instructors did bad things that contributed to the environment at VHS. But if Trujillo is correct in alleging that Mayerstein abused students and that he -- and not Trujillo -- created all the problems at VHS, that proof may help Trujillo show that the reasons Lynn gave for Trujillo's independent conduct were pretextual. If Trujillo can show that Mayerstein was to blame for the turmoil at VHS, it may undercut Lynn's observations that there was tension and inappropriate conduct by both instructors, and that Trujillo used students as pawns and contacted parents to support his position. In other words, if Trujillo can show that Mayerstein was

responsible for all of the turmoil, it may show that Lynn's conclusions were not true.

If Mayerstein was solely responsible for the turmoil at VHS, a jury may conclude it was less likely that Lynn honestly believed, based upon her discussions with students and parents, that Trujillo was not available to students, was not a good role model, acted like a child, and limited his time at VHS.  In other words, if Lynn or APS are not being truthful on certain aspects of the turmoil at VHS, they may not be accurate on Trujillo's role.  It is unclear how the jury will be able to determine whether what APS told the Air Force was false without some knowledge whether what Trujillo was saying about Mayerstein was false.

It is true, however, that to determine pretext, the jury does not have to determine whether what APS said about Mayerstein was true or false.  The jury need only determine whether APS held an honest belief that what Trujillo had done was true.  But if APS' belief that both Trujillo and Mayerstein were to blame is false, that would cast doubt on whether what APS told the Air Force was the truth.

APS suggests that there is no issue about whether APS honestly believed that Mayerstein had done inappropriate things to students.  APS may concede that point, because Lynn also recommended his termination, but there is no assurance that Mayerstein will agree to these changes.

Proving intent is a difficult task in a Title VII case, and Trujillo has that burden throughout the proceedings.  He must, to a large extent, rely upon circumstantial evidence.  That Mayerstein was abusing students may lend some support to Trujillo's contention that he was disciplined for reasons other than the hostile learning environment.

APS can defeat Trujillo's claim of retaliation under Title VII by producing a legitimate, non-discriminatory reason for its conduct.  APS will most likely be able to do so at trial, thus requiring Trujillo to meet his burden of proving that APS's stated reason is a pretext for retaliation.  The Court

is not certain how Trujillo will be able to meet this burden unless the Court allows him to introduce some evidence of what was taking place between Trujillo and Mayerstein.

For example, on or about April 7, 2002, VHS parents of ROTC students staged a demonstration, which the media covered, to complain about Mayerstein.  The parents demonstrated in front of the school -- and on the evening news -- against what they perceived was happening in the AFJROTC program, and specifically against Mayerstein's abusive behavior to the students.  APS asserts that Trujillo's supporters orchestrated the event.  Trujillo asserts that he did not instigate the demonstrations.

In any event, students and parents began to take sides between Mayerstein and Trujillo.  All parties agree that a hostile educational environment existed at VHS in the spring of 2002.  See Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 992.  On April 8, 2002, many parents also came to the APS Service Center to complain about Mayerstein.

Griego contacted the military to conduct an investigation.  Griego also contacted APS' OEOS, requesting an investigation and stating that Mayerstein's and Trujillo's conduct "was adversely impacting the students."   On April 22, 2002, Barbara Lynn, the Director of APS' OEOS, recommended that both Mayerstein and Trujillo be placed on paid administrative leave for the remainder of the school year pending an investigation into whether the conduct between them had "lead to a hostile educational environment for the students."

In response to Trujillo's insistence that Griego needed to talk directly to the ROTC cadets to find out what was going on in the ROTC program, Lynn also interviewed VHS ROTC Cadet Officers.  Given that APS thought it was important to hear from the cadets, it may be important that the jury do so, too.  It was after that dialogue that Lynn stated in her report that there was "tension and inappropriate conduct" between Mayerstein and Trujillo that impacted the classroom.  Lynn also

accused Trujillo of contacting parents to solicit their support for his position.  Lynn also listed concerns about Mayerstein, including his use of profanity with students; demeaning, threatening, and belittling students in front of their peers; and retaliating against students who exercised their right to seek assistance from the VHS administration.  She recommended that APS terminate both instructors.

It is unclear how the jury will be able to determine whether what APS told the Air Force was false without some knowledge whether what Trujillo was saying about Mayerstein was false.  It appears that, if APS persists in saying that they took adverse action against Trujillo in part because of his interactions with students, he needs to show pretext by demonstrating parent and student complaints of Mayerstein's abuses.

On the other hand, the Court is concerned that Trujillo is attempting to introduce too much evidence and present too many witnesses on the issue.  APS does not like evidence of Mayerstein's abuses, but probably will not dispute them.  Lynn listed some abuses in her OEOS report. Nevertheless, Mayerstein may not be so eager to agree to Trujillo's charges.  Trujillo is entitled to show that Mayerstein was abusing students.  If APS is intent on accusing Trujillo of creating an environment in which the students were adverse to Mayerstein's conduct and actions, Trujillo is entitled to explain why that was the case.

Trujillo needs, however, to remember that whether APS retaliated against him because he complained of discrimination of students at the hands of Mayerstein to Griego and Smith in November and December 2001 is not an issue in this case.  That allegation is not protected activity, and he thus cannot assert in this case that APS retaliated against him for those complaints.  Trujillo should not focus on Mayerstein's alleged discrimination of the students.  Trujillo needs to introduce enough information to show that Mayerstein -- not Trujillo -- created the hostile educational environment and that the reason is a pretext for retaliation for his support of Lourdes' EEOC charges

and his own EEOC charges.  All of his witnesses may not be necessary to achieve that task.

Trujillo thus needs to be careful that his witnesses are not unduly cumulative or saying the same thing.  For example, he has about eleven witnesses listed on this point, which is not a central issue and may not be hotly disputed.  He has many exhibits that go to the same issue.  Unless these witnesses or exhibits are all going to say something very different, Trujillo should cut the list to about three witnesses and reduce considerably the exhibit list.  Trujillo should select about three parents or students who complained.  He needs to be careful that parents who did not complain are not merely stating what their children stated; if Trujillo is attempting to use the parents' testimony to prove the truth of the matter their children stated, such testimony is likely to be hearsay.  If Trujillo feels a need to actually prove abuse, it will have to come from eyewitnesses -- the students -- and not the parents.

To assist Trujillo cut down his witness list, the Court notes a number of problems with Trujillo's proposed witnesses and his descriptions of their likely testimony.  For example, the Court does not see the relevance whether Griego and Smith responded to complaints or that Trujillo was professional and courteous when listening to complaints.

Also, it is not clear to the Court how Trujillo's reporting to Juan Jose Pena is relevant to any issue in this case.  Furthermore, Trujillo will need to make certain that Maximo Hernandez' testimony about Trujillo's "protected speech" is not an attempt to litigate the First Amendment issues that the Court has dismissed from the case.  Finally, the Court does not see how Mayerstein's failure to respond to complaints is relevant.

In sum, the Court will allow some limited testimony about Mayerstein's treatment of cadets and their parents' complaints about the treatment for the limited purpose of showing that APS' reasons for disciplining Trujillo were false.  The Court will, however, be vigilant to not allow hearsay

-19-

and to cut off the testimony that becomes cumulative.  The Court concludes that, unless Trujillo can show that the witnesses will testify to relevant, non-cumulative facts, it will exclude some of them and their testimony as described in Trujillo's witness list.  See Plaintiff's Trial Witness List at 2-4, filed June 8, 2007 (Doc. 344):

The Court is not saying that these witnesses may not be called to rebut testimony that APS presents.  It is possible that APS may, in showing its legitimate, non-discriminatory reasons for its actions, open the door for this testimony or more of it.  At this time, however, the Court does not see the relevance of most of the testimony or exhibits in Trujillo's case-in-chief.

**IT IS ORDERED** that the Defendants' Motions in Limine (Docs. 363 and 364) are denied in part and granted in part, as set forth in this memorandum opinion and order.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and Parties*:

Transito Trujillo
Albuquerque, New Mexico

*Pro Se Plaintiff*

Max J. Madrid
Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk
Albuquerque, New Mexico

*Attorneys for Defendants Board of Education,*
*Albuquerque Public Schools; Joseph Vigil;*
*Susie Peck; Anthony Griego; Bruce Smith;*
*and Ronald Williams*

Sean Olivas
Keleher & McLeod

-20-

Albuquerque, New Mexico

*Attorney for Defendant Mark Mayerstein*